BLUE CROSS AND BLUE SHIELD
OF NEW JERSEY, INC., et al.,
Plaintiffs,

v.

PHILIP MORRIS, INCORPORATED,
et al., Defendants.

No. 98 CV 3287.

United States District Court,
E.D. New York.

Sept. 19, 2000.

Dewey Ballantine LLP, New York by Paul J. Bschorr, Vincent R. FitzPatrick, Jr., Jack E. Pace III, Paul B. Carberry, Robert J. Morrow, Dewey Ballantine LLP, Washington, DC, by Martha J. Talley, for Plaintiffs Blue Cross, et al.

Arnold & Porter, Washington, DC by Murray R. Garnick, Sedgwick, Detert, Moran & Arnold, San Francisco, CA, by Kevin J. Dunne, Sedgwick, Detert, Moran & Arnold, New York City by James T. Conlon, for Defendant Philip Morris, Incorporated.

Sedgwick, Detert, Moran & Arnold, New York City by David M. Covey, Kirland & Ellis, Washington, DC by Kenneth N. Bass, for Defendant Brown & Williamson Tobacco Corporation.

Greenberg Traurig, LLP, New York City by Alan Mansfield, Shook, Hardy & Bacon, LLP, Kansas City, MO by Gary R. Long, for Defendants Lorillard Tobacco Company, Lorillard, Inc.

Debevoise & Plimpton, New York City by Steven Klugman, for Defendant Council for Tobacco Research, U.S.A., Inc.

Jacob, Medinger & Finnegan, LLP, New York, By Barry S. Schaevitz, for Defendant Smokeless Tobacco Council, Inc.

Womble, Carlyle, Sandridge, & Rice, PLLC, Atlanta, GA by R. Dal Burton, for Defendants R.J. Reynolds Tobacco Co., and RJR Nabisco, Inc.

Chadbourne & Parke LLP, New York City by Thomas J. McCormack, for Defendant British American Tobacco (Invest-

ments) Limited (formerly known as British–American Tobacco Company Limited).

Simpson Thacher & Bartlett, New York City by Joseph McLaughlin, for Defendant BAT Industries P.L.C.

Davis & Gilbert, LLP, New York City by Bruce M. Ginsberg, for Defendant Hill & Knowlton, Inc.

Kasowitz, Benson, Torres & Friedman LLP, New York City by Michael M. Fay, for Defendants Liggest Group Inc., Lig-

gest & Myers, Inc., and Brooke Group Ltd.

Skadden, Arps, Slate, Meagher & Flom, LLP, New York City by Peter J. McKenna, for Defendant United States Tobacco Company.

Seward & Kissel, New York City by Anthony R. Mansfield, for Defendant The Tobacco Institute, Inc.

*MEMORANDUM & ORDER*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I INTRODUCTION .................................................. 352
II FACTS........................................................... 354
 A. Blues ..................................................... 354
 B. Tobacco ................................................... 355
 1. Health Effects........................................ 355
 2. Industry Conspiracy .................................. 356
 a. Formation and Execution.......................... 356
 b. Knowledge ....................................... 358
 c. Coverup.......................................... 359
 d. Other Deceptive Conduct ......................... 360

III SUMMARY JUDGMENT STANDARD ................................. 363

IV RICO .......................................................... 364
 A. Racketeering ............................................. 364
 1. Scheme Components .................................... 364
 2. Application to B.A.T. ................................ 367
 B. Section 1962(c) .......................................... 368
 1. Direct Claims ....................................... 368
 a. Causation–In–Fact: Reliance ..................... 369
 b. Proximate Causation ............................. 371
 2. Subrogated Claims ................................... 372
 a. Constitutional Challenges........................ 372
 i. Due Process ................................ 373
 ii. Jury Right ................................. 375
 b. State Law Challenges ............................ 376
 i. Federal Common Law v. New York Law ........ 376
 ii. Treble Recovery ........................... 378
 iii. Aggregate Adjudication .................... 379
 iv. N.Y. CPLR 4545(c) ......................... 380
 3. Statute of Limitations .............................. 380
 4. Future Damages....................................... 382
 C. Section 1962(a) .......................................... 383
 D. Section 1962(d) .......................................... 384

V STATE FRAUD–BASED ACTIONS.................................... 385

VI PREEMPTION .................................................... 386

VII CONCLUSION .................................................... 388

The defendants have moved for summary judgment on various grounds. *See* Fed.R.Civ.P. 56. For the reasons indicated below, summary judgment is granted as to some causes of action and denied as to others. The action is ordered to proceed to trial.

## I INTRODUCTION

Plaintiffs, various Blue Cross and Blue Shield Plans ("Blues") from around the Nation, seek recovery against the major tobacco product manufacturers and related entities ("Tobacco") for alleged misrepresentations and omissions of material facts and for similar deceptive conduct regarding the deleterious effects of tobacco use on their clients' ("Plan members") health that has resulted in increased costs for the Blues.

Three of the Blues' theories of recovery are based on alleged racketeering activity pursuant to the Federal Racketeer Influenced Corrupt Organization Act ("RICO"). *See* 18 U.S.C. §§ 1962, 1964. Summarily stated, these theories are:

1) Tobacco engaged in a fraudulent scheme of misinformation *directed at Plan members* (and the population at large) to encourage them to smoke (and not to cease smoking) and to use smokeless tobacco products, thus causing them to suffer tobacco-related injuries and illnesses that they otherwise would not have suffered, and in turn forcing the Blues to pay substantially higher amounts for treatment of these maladies than otherwise would have been required, *see id.* § 1962(c) ("RICO Payment Action") (This action is also pled in the alternative based upon equitable subrogation ("Subrogated RICO Payment Action"));

2) Tobacco engaged in a fraudulent scheme of misinformation *directed at the Blues* to cover-up, minimize, and create the appearance of an "open controversy" as to the deleterious health effects of tobacco resulting in the Blues detrimentally relying on this information in failing to institute smoking cessation programs, to adopt differential health-insurance premiums for smokers and non-smokers, and to discourage tobacco use among Plan members, *see id.* § 1962(c) ("RICO Smoking Reduction Action");

3) Tobacco reinvested racketeering income and proceeds from a RICO enterprise *directed at the population generally and Plan members and the Blues particularly, see id.* § 1962(a) ("RICO Investment Action"). The RICO enterprise sought to control and influence the information distributed to the public concerning the health effects of smoking, to suppress and conceal scientific and medical information regarding the adverse health effects of smoking and the alternatives of safer or less-addictive cigarettes, to manipulate nicotine to create and sustain user addiction, and to avoid and shift tobacco-related health care costs to others including the Blues. *See* Plfs' Fourth Amended Compl. ¶ 295 (hereinafter "Compl."). The funds generated were reinvested into the RICO enterprise to perpetuate the fraudulent and deceptive conduct. *See* Compl. ¶ 296.

A fourth theory is based on fraud under state common law. Plaintiffs contend Tobacco engaged in a fraudulent scheme with the specific intent to mislead the Blues into "not taking actions to discourage and reduce tobacco use by the [Blues] Plan[ ] members," *see* Compl. ¶¶ 332, 334; *see also id.* ¶ 353, resulting in an increased incidence of tobacco-related illnesses among Plan members and, in turn, substantially higher health care expenditures by the Blues ("Direct Fraud Action").

A fifth theory is based on combined principles of equitable subrogation and

common-law fraud ("Subrogated Fraud Action"). *See* Compl. ¶¶ 335, 347; *see also id.* ¶ 354. Plaintiffs contend Tobacco engaged in a fraudulent scheme with the specific intent of misleading the general public, including Plan members, thereby inducing continued purchasing, use and addiction to tobacco products, "to the detriment of the [Blues] which paid for the health care and treatment of the [resulting] tobacco-related illnesses[.]" Compl. ¶¶ 335, 347.

A sixth theory is based on claims under the New York Consumer Protection Act. *See* N.Y.Gen.Bus.Law §§ 349 (deceptive acts and practices), 350 (false advertising). This action is advanced both as a direct action and as a subrogated action to recover tobacco-related health care outlays made by the Blues on behalf of Plan members.

Finally, plaintiffs have pled a multitude of state law claims specific to the various state Blues.

Plaintiffs' state law claims were earlier stayed. *See Blue Cross & Blue Shield of N.J. v. Philip Morris*, 36 F.Supp.2d 560, 588 (E.D.N.Y.1999).

As noted by this court in addressing summary judgment motions in a related tobacco case, "[t]he unique character of the massive, nationwide, longstanding, and ongoing fraudulent schemes alleged, and the enormous damages claimed to have resulted, require flexibility in approaching the novel factual and legal issues presented by this extraordinary case." *Falise v. American Tobacco*, 91 F.Supp.2d 525, 527 (E.D.N.Y.2000) (preliminary summary judgment order). Though the court remains skeptical of plaintiffs' ability to fully support their allegations, a sufficient showing has been made—subject to a *Daubert* hearing on the validity of the proposed statistical models relied upon by plaintiffs—to warrant a jury trial.

The parties have engaged in extensive discovery, supplied the court with volumes of documentation and argued opposing contentions at length. Based on these proceedings (and upon all other proceedings in the related tobacco cases pending in this court), and in shaping the case for jury trial and in resolving defendants' various summary judgment motions, it is ordered:

I Claims of plaintiff Empire Blue Cross & Blue Shield of New York ("Empire") shall be tried together prior to trial of the remaining Blues plaintiffs. The summary judgment motions relating to the other Blues plaintiffs are denied with leave to renew at the completion of trial of Empire's claims.

II Summary judgment is denied with respect to Empire's RICO Payment Action. *See supra* ¶ 1. With respect to the limitations period, Empire may seek recovery of payments for tobacco-related health claims filed with it on or after April 29, 1994 (four years before the filing of the original complaint) to the date of trial. The filing of a claim with Empire is to be deemed the date on which that particular injury to it accrued for purposes of the statue of limitations. Empire may not seek damages for projected claims to be filed in the future in the present action.

III Summary judgment is denied with respect to Empire's Subrogated RICO Payment Action. *See supra* ¶ 1.

IV Summary judgment is granted with respect to Empire's RICO Smoking Reduction Action. *See supra* ¶ 2.

V Summary judgment is granted with respect to Empire's RICO Investment Action. *See supra* ¶ 3.

VI Defendants' motion for partial summary judgment arguing that certain alleged wire fraud and mail fraud RICO predicate violations are preempted by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 *et seq.*, is denied,

VII Defendant B.A.T.'s motion for summary judgment as to claims against it is denied.

VIII The stay of Empire's state law claims is lifted with respect to the Subrogated Fraud Action and the New York Consumer Protection Act claims. These claims, all of which sound in fraud, involve substantially the same factual allegations as the RICO actions, thus requiring minimal additional discovery. Resolution of these claims with Empire's RICO Payment Action would not prove unduly confusing or burdensome for the parties, court, or the jury, nor would it delay the commencement of trial. The parties should endeavor to make any substantive motions with respect to the Subrogated Fraud Action and the New York Consumer Protection Act claims in an expeditious manner. The earlier stay shall remain in effect as to the other causes of action.

VIII Summary judgment is granted with respect to the Direct Fraud Action.

The explanation for these orders is provided below. *See* Parts IV, V, & VI, *infra.*

## II FACTS

### A. Blues

The plaintiffs ("Blues") are twenty-one medical provider-insurer Blue Cross and Blue Shield plans from across the United States. They and their predecessors have been providing health care insurance coverage and related services to their members since the beginning of the Twentieth Century. *See id.* ¶ 12. Tens of millions of Americans have depended upon them for a broad range of health care benefits and related services as the largest non-governmental provider of health insurance coverage and related services in the country. *See* Fourth Amended Compl. ¶¶ 1, 12 (hereinafter "Compl."). Presently almost seventy million people look to them for medical protection.

Originally established as "insurers of last resort" in their respective states, the Blues have historically provided health care protection to any individual regardless of that person's medical condition. *See id.* ¶ 14. Even today, most of the Blues continue to act as insurer of last resort, covering sicker and lower income Americans. *See* Mem. of Law in Opp. to Summ. Judg. for Lack of Direct Injury and Failure to Offer Individ. Proof as to Subrog. Claims, at 13–15 (hereinafter "Opp. Mem. on Direct Injury").

The Blues are independent licensees of the Blue Cross and Blue Shield Association, through which the various Blue Cross and Blue Shield plans license the right to use the Blue Cross ® and Blue Shield ® names and symbols. They operate within defined geographic regions, in most cases based on state lines. *See id.* ¶ 13.

On the demand side of the health insurance equation, the Blues contract with individuals, governments (at the federal, state and local level), employee and labor groups, businesses, associations and other institutions to provide health plan benefits and related services. Regardless of the costs of care, the Blues are responsible for payment. *See id.* ¶ 18. On the supply side, the Blues directly contract with thousands of medical care providers, including doctors, clinics, hospitals, and others for services to be rendered to Plan members. *See id.* ¶ 17; *see also* Opp. Mem. on Direct Injury, at 11; *see generally* George J. Annas, Sylvia A. Law, Rand E. Rosenblatt, & Kenneth R. Wing, *American Health Law* ch. 2, at 121–64 (1990).

As plaintiffs, the Blues seek recovery of their expenditures for Plan members in treating tobacco-related diseases and nicotine addiction. *See id.* at 19. The Blues contend that a substantial portion of these costs are due to a massive and sustained fraudulent conspiracy designed and carried

out by Tobacco to mislead the American public about the dangers of tobacco use and nicotine addiction, to prevent the introduction of less harmful or addictive tobacco products, and to shift the health care costs of treating tobacco-related illness onto the Blues and others. *See* Compl. ¶¶ 76, 77, 99, 102.

B. Tobacco

1. Health Effects

The toll from smoking-related diseases is enormous. Other mass health disasters such as those attributable to asbestos are relatively insignificant compared to the calamity brought about by tobacco use. *Cf. In re Joint Eastern and Southern District Asbestos Litig.*, 129 B.R. 710, 736 (E.D.N.Y.1991). Smoking-related illnesses account for one of every five deaths each year in the United States, making cigarette smoking the leading cause of premature death in the United States. *See* Compl. ¶ 62. Based on statistics from the Federal Centers for Disease Control and Prevention, annually smoking-related illnesses kill more than 400,000 Americans, exceeding the combined deaths caused by automobile accidents, AIDS, alcohol use, illegal drug use, homicide, suicide and fires. *See id.* ¶ 62.

Tobacco use is responsible for:

- cancers of the lung, mouth, larynx, esophagus, stomach, pancreas, uterus, cervix, kidney and colon (*see id.*);
- pulmonary diseases such as emphysema and bronchitis (*see id.*);
- cardiovascular diseases such as strokes, heart attacks, peripheral vascular disease, and aortic aneurysms (*see id.*); and
- reproduction problems such as reduced fertility, increased rates of miscarriages and stillbirths, retarded uterine fetal growth and lowered infant birth weight (*see id.* ¶ 64).

All told, the 43 carcinogenic chemicals inhaled by persons smoking defendants' products have been linked to 85% of all lung cancer, 30% of all deaths from other cancers, and 80% of deaths from pulmonary diseases. *See id.* ¶ 63.

In addition to disease and illness, smoking cigarettes can lead to nicotine addiction. Nicotine is the chemical substance in cigarettes that creates the "smoking high" smokers experience. Once in the blood stream, nicotine is carried almost immediately to the brain where it sets off a series of chemical reactions that alter mood and produce feelings of both sedation and stimulation. It also activates the transmission of a natural chemical, dopamine, that generates pleasurable body sensations, which ultimately causes a craving for nicotine delivered by cigarette smoking. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 1319–20, 146 L.Ed.2d 121 (2000) (Breyer, J., dissenting) (describing physiological reactions resulting from nicotine use).

So powerful is the addictive force of nicotine that, in "the absence of nicotine, the addicted smoker suffers symptoms of physical withdrawal, including headaches, constipation, insomnia, depression, inability to concentrate and anxiety." Compl. ¶ 66. According to the Surgeon General of the United States, nicotine addicts in much the same way as heroin and cocaine. *See id.* ¶ 67. Many smokers are unable to quit until they suffer a heart attack or contract lung cancer, and even then, of those who survive the ordeal approximately one-half will return to smoking. *See id.*

The deleterious health effects of smokeless tobacco products, such as snuff and chewing tobacco, are nearly as staggering as those caused by smoking cigarettes. *See id.* ¶ 69–71. Smokeless tobacco contains potent carcinogens that can increase the risk of cheek and gum cancers nearly fifty fold. *See id.* ¶ 69. Use of smokeless tobacco can also lead to oral leukoplakia, cancer of the gum, mouth, pharynx and larynx, the development of precancerous lesions of the soft tissue around the mouth, and an increased risk of cancer of the

esophagus. *See id.* ¶ 70–71. The use of snuff in particular can cause gum recession, the discoloration of teeth and fillings, dental cavities and abrasions of the teeth.

### 2. Industry Conspiracy

#### a. Formation and Execution

Plaintiffs allege that, beginning with a clandestine meeting in December 1953 at the Plaza Hotel in New York City among the presidents of Philip Morris, R.J. Reynolds, American Tobacco, Brown & Williamson, Lorillard and U.S. Tobacco, Tobacco embarked on a systematic, half-century long scheme to:

"(a) stop competing with each other in making or developing less harmful cigarettes; (b) continue knowingly and willfully to engage in misrepresentations and deceptive acts by, among other things, denying knowledge that cigarettes caused disease and death and agreeing not to disseminate harmful information showing the destructive effects of nicotine and tobacco consumption; (c) shut down research efforts and suppress medical information that appeared to be adverse to the Tobacco Companies' position that tobacco was not harmful; (d) not compete with respect to making any claims relating to the relative health-superiority of specific tobacco products; and (e) to confuse the public about, and otherwise distort, whatever accurate information about the harmful effects of their products became known despite their [efforts to conceal such information.]"

Compl. ¶ 104; *see also Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 329–33 (E.D.N.Y.2000).

This meeting was a response to a series of epidemiological and toxicological reports linking tobacco consumption with lung cancer. *See* Compl. ¶¶ 99–101; *see also* Kenneth R. Foster, David E. Bernstein, & Peter W. Huber, *Phantom Risk: Scientific Inference and the Law* 4 (1994) ("Epidemiological studies by Doll and Hill (1952) conducted in the early 1950s strong-

ly indicated that a pack-a-day smoker has a tenfold higher chance of developing lung cancer than a nonuser."); *see generally* David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph Sanders, 2 *Modern Scientific Evidence: The Law and Science of Expert Testimony* §§ 27–1.0 to 28–2.4 (1997) (epidemiological studies and toxicological studies); Linda A. Bailey, Leon Gordis and Michael Green, *Reference Guide on Epidemiology, in* Federal Judicial Ctr., *Reference Manual on Scientific Evidence* 121 (1994) (hereinafter *Reference Manual* ); Bernard D. Goldstein and Mary Sue Henifin, *Reference Guide on Toxicology, in Reference Manual, supra,* at 181. These studies threatened dramatic reduction in tobacco product sales and industry stock prices. *See* Compl. ¶ 101.

To carry out the conspiracy, Philip Morris, R.J. Reynolds, Brown & Williamson, American Tobacco, Lorillard and U.S. Tobacco—with the · assistance of the New York-based public relations firm of Hill and Knowlton—formed the Tobacco Industry Research Committee ("TIRC") in January 1954. *See id.* ¶ 109. Renamed the Council for Tobacco Research ("CTR") in 1964 when Liggett became a member, it was to create the false appearance that Tobacco was carrying out "objective, independent, and unbiased" research into the health effects of tobacco consumption, all the while actually "conduct[ing] a campaign of deceit, misrepresentation and misinformation ... about the [real] health risks of smoking." *See id.* ¶ 147.

To support their claims that the TIRC, and later the CTR, were integral to Tobacco's alleged conspiracy to deceive the public, plaintiffs rely heavily on the "Frank Statement to Cigarette Smokers," a joint statement by five of the tobacco manufacturers. It was published "in newspapers in virtually every city with a population of 50,000 or more, reaching more than 43 million Americans out of a population at the time of approximately 150 million." *Id.* at ¶ 110. It explicitly announced that:

- "[T]here is no proof that cigarette smoking is one of the causes of lung cancer." (*Id.* ¶ 110(c));

- "[Tobacco] always h[as] and always will cooperate closely with those whose task it is to safeguard the public health." (*Id.* ¶ 110(f));

- "[Tobacco is] pledging aid and assistance to the research effort into all phases of tobacco [product] use and health." (*Id.* ¶ 110(g));

- "For this purpose [Tobacco is] establishing a joint industry group .... This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE." (*Id.* ¶ 110(g) (capital letters in original)); and

- "In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry." (*Id.* ¶ 110(i)).

It is plaintiffs' contention that Tobacco intended the public as well as health care payers, including the Blues, to rely upon the reports, research, and communications of the TIRC—and the companies generally—in assessing the dangers of tobacco use. *See id.* ¶ 111. As support for their allegation that the TIRC was never intended as the objective research council advertised, plaintiffs rely on disclosures in internal Tobacco documents such as the following:

- "[TIRC] was set up as an industry shield in 1954. That was the year statistical accusations relating smoking to diseases were leveled at the Industry; litigation began; and the Wynder/Graham reports were issued. [TIRC] has helped out legal counsel by giving advice and technical information, which was needed at trials .... [T]he public relations value of [TIRC] must be considered and continued.... It is very important the industry continue to spend their [sic] dollars on research to show that we don't agree that the case against smoking is closed." (Compl. ¶ 154(a));

- "Historically, the joint industry funded smoking and health research programs have not been selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc.... In general, these programs have provided some buffer to public and political attack of the industry, as well as background for litigious [sic] strategy." (*Id.* ¶ 154(c));

- "To date, the TIRC program has carried its fair share of the public relations load in providing materials to stamp out brush fires as they arose. While effective in the past, this whole approach requires both revision and expansion. The public relations program ... was like the early symptoms of diabetes—certain dietary controls kept public opinion reasonably healthy. When some new symptom appeared, a shot of insulin in the way of a news release ... kept the patient going." (*Id.* ¶ 154(e)); and

- "For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts—litigation, politics, and public opinion. While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not—nor was it intended to be—a vehicle for victory. On the contrary, it has always been a holding strategy, consisting of creating doubt about the health charge without actually denying it." (*Id.* ¶ 154(g)).

To complement the fraudulent efforts of the TIRC and CTR, Tobacco in 1958 formed The Tobacco Institute ("TI")—a New York non-profit corporation that operated in Washington, D.C.—as a lobbying arm for the industry. *See id.* ¶ 57. In 1969, U.S. Tobacco, the largest manufacturer of smokeless tobacco products in the United States, formed a third organization,

The Smokeless Tobacco Council, Inc. ("STC"), as a propaganda and lobbying agent. *See id.* ¶ 59. Though ostensibly focused on protecting the interests of smokeless tobacco manufacturers, plaintiffs allege that STC operated in conjunction with the industry generally, receiving financial support from Brown & Williamson, Lorillard and R.J. Reynolds. *See id.*

### b. Knowledge

Although the TIRC, CTR, and TI continued to release public statements and reports indicating smoking neither caused adverse health effects nor was addictive—as well as to finance research to support these claims—the Blues contend that all the while Tobacco in fact knew the contrary to be true: that smoking is both lethal and addictive. *See* Compl. ¶¶ 122–146

Internal documents from defendants indicate that through independent company research and the sharing of this research through the TIRC and CTR, each of the major tobacco product manufacturers was aware early on that Tobacco contributed to lung cancer. For example, a 1956 confidential memorandum from a Philip Morris Vice President of Research and Development to top executives at the company regarding the advantages of "ventilated cigarettes" stated: "Decreased carbon monoxide and nicotine are related to decreased harm to the circulatory system as a result of smoking .... [D ]ecreased irritation is desirable ... as a partial elimination of a potential cancer hazard." *Id.* ¶ 130 (emphasis added). Similarly, a BATCO document produced in 1958 following a series of meetings between BATCO representatives and twenty American scientists and researchers—including at least nine representatives of the tobacco companies and the Scientific Advisory Board of TIRC—states that all of the tobacco company researchers with whom they met (and all but one of the outside people) "believed that smoking ·causes lung cancer" and notes that there was "general acceptance [among the group] that the

most likely means of causation is that tobacco smoke contains carcinogenic substances present in sufficient quantity to promote lung cancer when acting for a long time in a sensitive individual." *Id.* ¶¶ 123–124. That same year, a Philip Morris Vice President of Research, who later joined its Board of Directors, stated in a confidential internal memorandum that "the evidence ... is building up that heavy cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors." *Id.* ¶ 132. A 1963 confidential internal memorandum from Liggett's research consulting firm admitted: "Basically we accept the inference of a causal relationship between the chemical properties of ingested tobacco smoke and the development of carcinoma ...." *Id.* ¶ 135.

In addition to knowing early on that smoking is linked to lung cancer, the Blues allege that Tobacco was aware of other major deleterious health effects caused by smoking, including bronchitis, emphysema, and cardiovascular disease. To support this contention, plaintiffs identify the following excerpts from internal company documents:

● A 1963 confidential memorandum to Philip Morris's President and CEO describes components of cigarette smoke as "known carcinogens" and states: "Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have predicted that the cigarette industry ultimately may be in greater trouble in this area than in the lung cancer field." (*Id.* ¶ 137); and

● An internal memo produced for a B.A.T. Group Conference (e.g., BATCo, Brown & Williamson, and other subsidiaries of B.A.T. Industries) in November 1970 that states "nicotine

may be implicated in the aetiology of cardiovascular disease." (*Id.* ¶ 138).

The Blues also allege that Tobacco has understood at least for the past four decades that smokers continue to smoke not by choice, but because of nicotine addiction. *See id.* ¶ 125. As support, the Blues identify confidential BATCo documents related to BATCo's "Project Hippo" that indicate that at least as early as 1961 Tobacco was aware of the physiological and pharmacological effects of nicotine. Copies of Project Hippo reports were circulated to TIRC, BATCo, Brown & Williamson, and R.J. Reynolds.

A 1963 memorandum written by Addison Yeaman, General Counsel at Brown & Williamson, concludes: Tobacco is "in the business of selling nicotine, *an addictive drug.*" *Id.* ¶ 126. Similarly a 1978 internal Brown & Williamson memorandum acknowledges that "very few consumers are aware of the effects of nicotine, i.e., *its addictive nature* and that *nicotine is a poison.*" *Id.* ¶ 145 (emphases added). Overwhelming evidence that Tobacco was aware of nicotine's addictive properties is a 1972 report by Philip Morris presented at a CTR conference; it states:

- "[N]icotine is the active constituent of cigarette smoke";
- "Without nicotine ... there would be no smoking.";
- "Why then is there not a market for nicotine per se, to be eaten, sucked, drunk, injected, inserted or inhaled as a pure aerosol? The answer, and I feel quite strongly about this, is that the cigarette is in fact among the most awe-inspiring examples of the ingenuity of man.";
- "The cigarette should be conceived not as a product but as a package. The product is nicotine ....";
- "Think of the cigarette pack as a storage container for a day's supply of nicotine ...."; and

- "Think of the cigarette as a dispenser for a dose unit of nicotine." (*Id.* ¶¶ 128–29).

### c. Coverup

The Blues contend that despite knowing that tobacco use is injurious and addictive, Tobacco—in part through the efforts of the TIRC, CTR, TI and STI—intentionally engaged in "a campaign of deceit, misrepresentation and misinformation directed at misleading the public about the health risks" and addictiveness of smoking. *Id.* ¶ 147.

Efforts allegedly undertaken by Tobacco to hide this information include the termination and destruction of Philip Morris research regarding nicotine's addictive properties. For example, in the early 1980s researchers working at a Philip Morris laboratory in Richmond confirmed that nicotine demonstrated addictive qualities and that the laboratory research animals self-administered the substance by pressing levers to obtain nicotine. Less than a year after a briefing to top Philip Morris executives on these findings by the director of the research, Dr. Victor J. DeNoble, Philip Morris representatives instructed the researchers to stop work, to kill all the laboratory animals, to turn in their security badges, and to withdraw a paper on the addictive qualities of nicotine that had been accepted for publication by a scientific journal. Philip Morris then closed the laboratory, fired the researchers, forced them to agree to remain quiet about their work, and threatened them with legal action if they published their findings. *See id.* ¶ 161.

Plaintiffs also point to confidential research conducted by Brown & Williamson's British affiliate on behalf of Brown & Williamson. In the course of this research, Brown & Williamson allegedly suppressed confidential findings of a "causal relation" between "ZEPHYR [Brown & Williamson's code name for cancer] and tobacco smoking." *Id.* ¶ 156.

**360**

As evidence of the central role the TIRC and CTR in Tobacco's alleged deceptive coverup, the Blues point to TIRC's establishment of a "Special Projects" division where research revealing the dangers and addictiveness of smoking "was secreted from the public and concealed from discovery in litigation[.]" *Id.* ¶ 163. Plaintiffs also identify a 1970 advertisement placed in newspapers around the nation by the TIRC at the direction of Tobacco claiming that there was no known link between cigarettes and disease despite, according to the advertisement, decades of "totally independent research." *Id.* ¶ 116. They also point to a public statement in 1982 by Edward A. Horrigan, Jr., then Chairman of the Executive Committee of the TI, claiming:

> After three decades of investigation and millions of dollars invested by the government, the Tobacco Industry and private organizations, the smoking and health controversy remains unresolved. The net result of all of this effort has been that no causal link between smoking and disease has been established. That is not merely the opinion of Tobacco Industry executives. That is scientific fact readily available to anyone willing to make an objective, unemotional study of the existing evidence.

*Id.* ¶ 118.

#### d. Other Deceptive Conduct

In addition to covering up the health risks and addictiveness of smoking, Tobacco is alleged to have intentionally enhanced nicotine concentration in cigarettes to increase smoker-addiction, misled the public to believe smoke from "lighter" cigarettes contained reduced levels of tar and nicotine relative to that released by conventional cigarettes, suppressed research into less harmful cigarettes, and specifically sought to shift liability for smoking-related illnesses from Tobacco to the health insurance industry, including the Blues.

Supporting the contention that Tobacco manipulated nicotine levels, the Blues identify various patents filed by defendants that provide the technological capability to manipulate nicotine levels in cigarettes "to an exacting degree." *Id.* ¶ 222. Examples include the following:

- A Philip Morris patent application for an invention that "permits the release ... in controlled amounts and when desired, of nicotine in tobacco smoke." (*Id.* ¶ 222(a));

- Another Philip Morris patent application explaining that the proposed invention is "particularly useful for the maintenance of the proper amount of nicotine in tobacco smoke" and noting that "previous efforts have been made to add nicotine to Tobacco Products when the nicotine level in the tobacco was undesirably low." (*Id.* ¶ 222(b)); and

- A 1991 R.J. Reynolds patent application stating that "processed tobaccos can be manufactured under conditions suitable to provide products having various nicotine levels." (*Id.* ¶ 222(c)).

To demonstrate that Tobacco manipulated nicotine levels to maximize smoker addiction rates, the Blues identify the use of ammonia in the manufacturing of cigarettes, which releases a more potent form of "free nicotine" replacing the slower acting salt-based nicotine naturally occurring in tobacco. *Id.* ¶ 221. The use of ammonia has the effect of almost doubling the "nicotine transfer efficiency of cigarettes." *Id.* ¶ 220. As John Kreisher, a former associate scientific director of CTR, put it: "ammonia helped the industry lower the tar and allowed smokers to get more bang with less nicotine." *Id.* ¶ 177.

The defendants were aware of ammonia's effect on nicotine levels in cigarette smoke. A 1991 Brown & Williamson confidential tobacco blending manual states:

> Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine

.... As the result of such change in the ratio of extractable nicotine to bound nicotine ... the smoke may be altered in favor of extractable nicotine. As we know, extractable nicotine contributes to impact in cigarette smoke and this is how ammonia can act as an impact booster.

*Id.* ¶ 221.

While defendants have allegedly been manipulating nicotine levels and potency in cigarettes, they have, according to the Blues, "continue[d] to deny to the public ... that they manipulate and control nicotine levels." *Id.* ¶ 224. Examples include:

- An April 1994 advertisement that Philip Morris ran in newspapers across the country affirmatively representing that Philip Morris does not "manipulate" nicotine levels in its cigarettes and that in any event "Philip Morris does not believe that cigarettes smoking is addictive." (*Id.* ¶ 227); and

- A similar R.J. Reynolds advertisement in newspapers across the United States in 1994 stating that "we do not increase the level of nicotine in any of our products in order to 'addict' smokers. Instead of increasing the nicotine levels in our products, we have in fact worked hard to decrease ... 'nicotine.'" (*Id.* ¶ 228).

Plaintiffs also allege that Tobacco "fraudulently promoted filtered and low-tar cigarettes as safer or healthier" cigarettes than conventional ones. *Id.* ¶ 166. According to plaintiffs, these "light" cigarettes, as they are commonly called, are not only lacking in "significant health benefits" over conventional cigarettes, but in "most instances ... increase the risk of emphysema, heart disease, and other diseases caused by smoking[.]" *Id.* ¶¶ 172. "This is because smokers of these [light] cigarettes tend to smoke more, inhale more deeply, and hold the smoke in their lungs longer, in order to maximize their intake of nicotine." *Id.*

The Blues allege that Tobacco knowingly "designed the[ ] so-called 'light' products so that advertised tar and nicotine levels understate the amounts of tar and nicotine actually ingested by human smokers." *Id.* ¶ 174. According to plaintiffs:

Such design features include a technique called filter ventilation in which nearly invisible holes are drilled in the filter paper, or the filter paper is made more porous. Predictably, many smokers of advertised low-tar and nicotine cigarettes block the tiny, laser generated perforations in ventilated filters with their fingers or lips, thereby resulting in greater tar and nicotine yields to those smokers than those measured by the FTC smoking machine.

*Id.*

It is claimed by the Blues that Tobacco "knew that the ability to block ventilation holes allows smokers to 'compensate' for nicotine losses that would otherwise be caused by tar-reducing modifications." *Id.* ¶ 175. Tobacco allegedly studied smoker behavior in order to design cigarettes that allow smokers to compensate for lower nicotine yields while appearing to deliver less nicotine in FTC tests. *See id.* ¶¶ 175–176. To support this contention, the Blues identify a research study presented at a 1974 BATCO conference which concluded that "'whatever the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern [of smoke inhalation] to deliver his own nicotine requirements (about 0.8 mg. per cigarette).'" *Id.* ¶ 176.

Rather than actually develop a less-harmful cigarette, as light cigarettes were advertised to be, Tobacco allegedly conspired by way of a "gentlemen's agreement" to suppress independent research, development and marketing of such a cigarette. *See id.* ¶ 184. According to plaintiffs:

[Tobacco] recognized a difference between 'health-oriented' cigarettes, which were never marketed on a wide basis, and 'health-image' cigarettes, such as

low-tar/low-nicotine products. The latter were only a marketing tool to give the illusion of a safer product. *Id.* ¶ 200.

As the Blues describe it, the situation among the six major tobacco manufacturers represented a dilemma: no company wanted a "safer" cigarette, but any company, by being the first to produce such a cigarette, stood to gain substantial market share. *See id.* ¶ 185. Lorillard's Director of Research and Development wrote to the Lorillard's president in 1966 regarding the development of a safer cigarette: "if we fail to pursue this research and/or a competitor marketed a cigarette whose smoke condensate gives little tumorigenic response, . . . a significant sales loss could result." *Id.* ¶ 191.

Production of such a "safer" cigarette by even one manufacturer would have represented an indictment of the whole industry, potentially unleashing litigation for earlier injuries and illnesses due to conventional cigarettes. As Jeffrey Wigand, a former Vice President for Research and Development for Brown & Williamson has testified, " '[a]ny research on a safer cigarette would clearly expose every other product as being unsafe and, therefore, present a liability issue in terms of any type of litigation.' " *Id.* ¶ 207.

Allegedly faced with the choice between abandoning the conspiracy and developing a less harmful cigarette on the one hand, or maintaining the conspiracy and avoiding potential liability for injuries resulting from conventional cigarettes on the other, the major tobacco manufacturers opted to maintain the scheme, aided in part by the highly concentrated industry market structure. *See id.* ¶¶ 72–73, 201–210; *see also id.* ¶ 72 ("In 1994, American Tobacco was acquired by B.A.T. and merged into Brown & Williamson [which itself was a B.A.T. subsidiary]. Philip Morris and R.J. Reynolds are the industry leaders with national market shares of approximately 48% and 25%, respectively, as of March 31, 1998. The approximate market shares of the oth-

er cigarette manufacturers are: Brown & Williamson, 17%; Lorillard, 8%, and Liggett, 2%."). As proof of Tobacco's conscious decision to trade-off decreased public injury from smoking for maintenance of its corporate profits, the Blues advance an excerpt from a confidential internal Philip Morris memorandum regarding Philip Morris's decision not to market a less harmful cigarette:

"[A]fter much discussion we decided not to tell the physiological story [regarding the health effects and addictiveness of conventional cigarettes] which might have appealed to a health conscious segment of the market. The product as test marketed . . . was unacceptable to the public ignorant of its physiological superiority."

*Id.* ¶ 202.

Plaintiffs identify two additional areas of deceptive conduct that, they allege, were central to Tobacco's conspiracy: the target marketing of cigarettes and other tobacco products to children; and the intentional deflecting of tobacco-related healthcare costs to health plan providers such as the Blues. Plaintiffs contend that Tobacco—with the use of sophisticated marketing tools such as Joe Camel—"systematically targeted" youth to encourage them to purchase cigarettes in violation of various state laws, including New York's, in order "to replace dying adult[ ] [smokers]." *Id.* ¶ 234. As support for this contention, plaintiffs identify excerpts from a 1974 R.J. Reynolds marketing plan that highlighted as an "opportunity area" a plan to "increase our young adult franchise," with "young adults" described as including those children 14 to 17 years of age. *Id.* ¶ 235.

As a final part of the conspiracy, Tobacco allegedly targeted "healthcare payors and other related entities . . . with misleading statements, political and economic pressure and other coercive, deceptive and fraudulent actions to prevent such entities from taking actions which might result in a

decrease in tobacco use among their covered persons." *Id.* ¶ 262; *see id.* ¶ 182 ("A primary purpose and effect of these decades-old denials and the suppression of scientific testing have been that ... [the Blues did not] ... act earlier and more aggressively to reduce cigarette smoking.").

It is alleged that Tobacco intentionally sought to induce in the Blues "the false impression that there was an open question whether tobacco use was harmful to health when they knew and believed the contrary." *Id.* ¶ 274. The underlying purpose was to forestall the introduction of differential health care insurance premiums for smokers and non-smokers, and to prevent the implementation of smoking cessation programs. *See id.* ¶¶ 269, 270, 274.

Supporting the Blues' contention that they were intentionally targeted with misinformation by Tobacco, the Blues identify an undated R.J. Reynolds memorandum entitled, "Discouraging Health Insurance Industry Discrimination Against Smokers," which expressly identified the "Blue Cross Blue Shield Association" as its targeted audience for a Tobacco campaign "to discourage unfair health insurance practices against smokers." *Id.* ¶ 268. Plaintiffs also identify a Tobacco Institute document entitled "Preliminary Draft Communications Plan" which states:

> The following is a program designed to respond to anti-smoking campaigns that are damaging to the tobacco industry ....
>
> *Tactics* .... Execute a special program targeted at medical personnel and health facility administrators .... This program would be intended to present evidence demonstrating that ... public smoking is not a health issue.

*Id.* ¶ 225.

The Blues contend that during all relevant times Tobacco knew the information it was targeting to third-party healthcare payors such as themselves was false. *See,*

*e.g., id.* ¶ 272. They also allege that they detrimentally relied on this misinformation in not instituting differential health-insurance-premium pricing between smokers and nonsmokers, and in not implementing smoking cessation campaigns. Either of these programs if implemented, the Blues contend, would have markedly reduced the incidence of smoking-related illnesses and thus the medical expenditures ultimately paid by the Blues. *See id.* ¶ 84.

## III SUMMARY JUDGMENT STANDARD

Rule 56 Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 5 (2d Cir.1999). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The burden rests initially with the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture[.]" *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").

In deciding the motion, all inferences and ambiguities are to be resolved in favor of the party opposing summary judgment.

See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted). Only when reasonable minds could not differ as to the import of the proffered evidence is summary judgment proper. See Anderson, 477 U.S. at 250–52, 106 S.Ct. 2505; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

## IV RICO

Discussion of similar civil RICO claims in Falise v. American Tobacco Co., 94 F.Supp.2d 316, 333–53 (E.D.N.Y.2000), is relied upon and incorporated into this memorandum.

### A. Racketeering

#### 1. Scheme Components

■ To make out a valid civil-RICO claim, a plaintiff must demonstrate that the defendants constituted an enterprise conducting its affairs through a "pattern of racketeering activity" resulting in injury to the plaintiff's business or property. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("A violation of section 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity .... In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.").

Racketeering activity "consists of no more and no less than the commission of a predicate act." Id. at 495, 105 S.Ct. 3275; see 18 U.S.C. § 1961(1). Section 1961(1) of RICO sets out an exhaustive list of predicate acts, including among others mail fraud and wire fraud.

■ To establish the requisite "pattern of racketeering," a plaintiff must identify "at least two acts of racketeering activity, ... the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C.

§ 1961(5); see also Agency Holding Corp. v. Malley–Duff & Assocs., Inc., 483 U.S. 143, 154, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("[T]he heart of any RICO complaint is the allegation of a pattern of racketeering."). As the Supreme Court has instructed, "while two acts are necessary, they may not be sufficient" to establish an actionable pattern of racketeering activity. Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. 3275 ("two isolated acts of racketeering activity do not constitute a pattern"). Rather, the predicate acts alleged must be sufficiently related and continuous to establish a true pattern. Id. at 496 n. 14, 105 S.Ct. 3275 ("continuity plus relationship" (emphasis in original)).

■ To satisfy the relatedness requirement, the acts must "have the same or similar purposes, results, participants, victims, methods of commission, or [be] otherwise ... interrelated by distinguishing characteristics and ... not isolated events." Id.; see H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 237–238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (section 1961(5) "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern"; "[i]t is not the number of predicates, but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged' " to constitute a pattern of racketeering activity); U.S. v. Polanco, 145 F.3d 536, 541 (2d Cir.1998) ("Predicate acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness). A predicate act is 'related' to an enterprise if it is related to the activities of that enterprise. A predicate act is related to a different predicate act if each predicate act is related to the enterprise." (internal citations and quotation marks omitted)).

■ Continuity requires a temporal examination of the duration of the predicate acts. See, e.g., H.J. Inc., 492 U.S. at 242,

109 S.Ct. 2893 (continuity is "centrally a temporal factor"). Generally, the longer the time period during which predicate acts took place, the more likely continuity exists, establishing the racketeering pattern. *See, e.g., id.* ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy th[e continuity] requirement: Congress was concerned in RICO with long-term criminal activity."); *Hindes v. Castle,* 937 F.2d 868, 873 (3d Cir.1991) ("While it is not in itself sufficient to establish a pattern, ... no pattern can be shown without the required duration."); *see also Eastern Publishing & Advertising Inc. v. Chesapeake Publishing & Advertising, Inc.,* 895 F.2d 971, 973 (4th Cir.1990) (a "scheme to defraud ... [may] demonstrate the requisite continuity ... either by its intrinsic nature or sheer duration"). If the predicate acts form part of a legal entity's regular course of doing business, continuity is established. *See, e.g., Tabas v. Tabas,* 47 F.3d 1280, 1296 (3d Cir.1995) ("as a regular way of doing business, defendants were fraudulently misrepresenting expenditures to benefit themselves and to deprive the [Estate] and its beneficiaries of their legitimate share of the profits.... [T]hese practices, defendants' regular way of doing business, continued even after plaintiffs' complaint was filed. As a consequence, plaintiffs have established a threat of continuing fraudulent conduct as required under an 'open ended' continuity analysis."); *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 447 (1st Cir.1990) (continuity is established if predicate acts are "a regular way of conducting the ongoing businesses" (citation and internal quotation marks omitted)).

■ A RICO " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also United States v. Masters,* 924 F.2d 1362, 1366 (7th Cir.1991) ("The statute says 'enterprise includes'—

not 'enterprise means.' The point of the definition is to make it clear that it need not be a formal enterprise."). *United States v. Huber,* 603 F.2d 387, 394 (2d Cir.1979) ("The definition of 'enterprise' is a list beginning with the word 'includes.' This indicates that the list is not exhaustive but merely illustrative."). The Supreme Court has identified three characteristics that must be established to prove a RICO enterprise: (1) it must be "an ongoing organization, formal or informal"; (2) it must function as a continuing unit; and (3) it must be more than the " 'pattern of racketeering activity' "—that is, it must be "an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

■ Multiple corporations or other legal entities can, when working in concert either overtly or covertly, form an association-in-fact RICO enterprise. *See, e.g., United States v. London,* 66 F.3d 1227, 1243 (1st Cir.1995) ("two or more legal entities can form or be part of an association-in-fact RICO enterprise"); *United States v. Blinder,* 10 F.3d 1468, 1473 (9th Cir.1993) ("a group or union consisting *solely* of corporations or other legal entities can constitute an 'associated in fact' enterprise" (emphasis in original)); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3d Cir.1989) ("nothing precludes an association of [two or more] corporations for illicit purposes from constituting an enterprise"); *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northwest Ohio,* 900 F.2d 882, 887 (6th Cir.1990) (citing with approval *Huber,* 603 F.2d at 393–94, for the proposition that "in view of the broad construction of RICO, a group of corporations can form an enterprise"); *United States v. Navarro–Ordas,* 770 F.2d 959, 969 (11th Cir.1985) ("a group of corporations can be a 'group of individuals associated in fact' within the meaning of the 'enterprise' definition of 18 U.S.C. § 1961(4)"); *Huber,* 603 F.2d at 393–94 (same).

■ Once a pattern of racketeering orchestrated through a RICO enterprise has been established, an actionable claim under civil RICO *against a particular defendant* still requires proof (1) that the particular defendant was distinct from the alleged RICO enterprise, (2) that the defendant was "employed by or associated with [the] enterprise" and (3) that the defendant "conduct[ed] or participat[ed], directly or indirectly, in the conduct of such enterprises affairs through [the] pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). With respect to the first requirement, "a single entity [such as a corporation] ... [may] be both the RICO [defendant] and one of a number of members of the RICO 'enterprise.'" *Cullen v. Margiotta*, 811 F.2d 698, 729–30 (2d Cir. 1987). Subsidiaries and other affiliates of a parent corporation—alone or together with the parent corporation—do not constitute a RICO enterprise distinct from the parent corporation. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063–64 (2d Cir.1996), *vacated on antitrust grounds*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (distinctiveness requirement not satisfied where the three corporate defendants constituted the alleged enterprise; though three separate legal entities, the three affiliates "operated within a unified corporate structure" and were "guided by a single corporate consciousness"); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y.1996) (association-in-fact enterprise consisting of parent company, subsidiaries, and their employees "ignores the required distinction between the culpable 'person' and the RICO 'enterprise'"); *Nebraska Security Bank v. Dain Bosworth Inc.*, 838 F.Supp. 1362, 1368 (D.Neb.1993) ("a parent corporation and its wholly owned subsidiary ... cannot together or alone form a RICO enterprise for § 1962(c) purposes when one or both are also the defendant 'person'").

■ As to the second requirement— that the defendant be "associated with" the RICO enterprise—mere alliance with a legitimate entity, not involving any of the alleged wrongdoing or participation in any predicate acts, is insufficient. *See, e.g., Gussin v. Shockey*, 725 F.Supp. 271, 277 (D.Md.1989) ("The mere fact [that a defendant] could be described as an agent for the ... [enterprise] does not give rise to that relationship with an enterprise which is encompassed by RICO .... [The defendant] must associate with an enterprise to carry on a pattern of racketeering activity. *That association must include an aspect of purpose to violate the act.*" (emphasis added)). A defendant is considered to have "associated with" a RICO enterprise if he engages in the predicate act violations with other members of the enterprise, even if he is not an actual "insider" of the enterprise. *See, e.g., Shulton, Inc. v. Optel Corp.*, Civ. No. 85–2925, 1986 WL 15617, at * 10 (D.N.J. Sept.29, 1986).

■ The third requirement, that the defendant has "conduct[ed] or participat[ed]" in the affairs of the enterprise, contemplates that the defendant be involved in the *operation, direction or management of the enterprise.* As the Supreme Court stated in *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993):

> In order to "participate, directly or indirectly, in the conduct of such enterprises's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

*Id.* (footnote omitted); *see also Schmidt v. Fleet Bank*, 16 F.Supp.2d 340, 347 (S.D.N.Y.1998) ("There is a 'substantial difference' between actual control over an enterprise and association with an enterprise in ways that do not involve control;

only the former is sufficient under *Reves* because 'the test is not involvement but control' "). A showing of active participation in at least partial orchestration or direction of the racketeering activities of the enterprise is generally sufficient to satisfy the "conduct or participate" requirement of section 1962(c).

### 2. Application to B.A.T.

■■ Defendant B.A.T. Industries—a British holding company created in 1976 as corporate parent of United States defendant Brown & Williamson Tobacco Corporation—seeks summary judgment for the RICO claims against it. It contends that Empire has failed to proffer evidence that B.A.T. was involved in a pattern of racketeering activity and that it conducted the affairs of a RICO enterprise. B.A.T.'s arguments lack merit.

B.A.T.'s assertion that it is entitled to summary judgment because it was not involved in a pattern of racketeering activity is based on a misinterpretation of the law. It argues that "[t]o survive a summary judgment motion, ... the requisite 'pattern' must be specifically demonstrated as to each defendant; i.e., *each defendant must have committed at least two predicate acts within 10 years of each other.*" B.A.T. Indus. Mem. for Summ. Judg., at 8 (emphasis added); *id.* at 11 ("None of the enumerated uses of the wires or mails alleged ... entails use of those media by B.A.T. Industries. Plaintiffs do not point to any specific acts *by B.A.T. Industries* which establish a pattern of racketeering activity under the RICO statute" (emphasis in original)); *see* B.A.T. Indus. Resp. for Summ. Judg., at 6 (no "evidence that B.A.T. Industries committed two predicate acts within 10 years of each other" and no evidence "that B.A.T. Industries committed two predicate acts at any time, regardless of the time period").

RICO Liability for any particular defendant is not, contrary to B.A.T.'s assertion, premised on establishing *that each defendant actually committed two predicate acts,* but only that each defendant was *"involved"* in the commission of two predicate acts that are sufficiently related and continuous to establish a pattern. *Wasserman v. Maimonides Med. Center,* 970 F.Supp. 183, 189 (E.D.N.Y.1997); *see also, e.g., Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990) ("[N]o defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern. *This participation need not be direct.*" (emphasis added)). Put more directly, RICO liability extends not only to the defendant who pulled the trigger, but also to the defendants who ordered and directed it.

Empire's proffered evidence raises material questions regarding B.A.T.'s active direction of Brown & Williamson Tobacco's efforts in the Tobacco Conspiracy, particularly Brown and Williamson's execution of various predicate mail and wire fraud acts. *See, e.g., Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 99–119 (E.D.N.Y.2000) (cataloguing B.A.T.'s participation in furthering the Tobacco Conspiracy). Documents and conference transcripts indicate that B.A.T.—in cooperation with the other major tobacco companies—ordered its subsidiaries (including Brown and Williamson) to adopt a fraudulent smoking and health position, *see id.* at 107–09, prohibited its subsidiaries from manufacturing a less harmful cigarette even though to do so was allegedly scientifically feasible, *see id.* at 113–14, promoted the enhancement of the nicotine content of its subsidiaries' cigarettes, *see id.* at 114–16, hid damaging research, *see id.* at 116–18, and extensively participated in the research, development, and marketing of cigarettes, *see id.* at 118–19; *see also id.* 123–24. Given B.A.T.'s apparent active direction of Brown and Williamson's fraudulent conduct—much of which appears to have been in furtherance of the Tobacco Conspiracy which is the crux of Empire's RICO actions—it cannot be concluded on a motion for summary judgment that B.A.T. did not "participate" or was not "involved" in the commission of

alleged RICO predicate mail and wire fraud violations carried out to further the Tobacco Conspiracy. *See* Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11.D.2.c., at 115 (2d ed.) ("In determining whether a pattern has been stated against any particular defendant, the court considers only the alleged offenses in which that defendant was purportedly involved, directly or indirectly, *or for which that defendant bears responsibility.*" (emphasis added)).

For much the same reason, B.A.T.'s contention that there is no material question regarding its participation in the affairs of a RICO enterprise is rejected. Though Empire has alleged a number of RICO enterprises, for purposes of this discussion they can be grouped into two categories: 1) six consisting of the major United States Tobacco manufacturers (including Brown & Williamson) with various organizations such as the CTR, TI and STC as the identified enterprises ("Manufacturers' Enterprises"), and 2) one consisting of B.A.T., Brown & Williamson, BACTCo and B.A.T.'s other tobacco subsidiaries ("the B.A.T. Enterprise").

■ With respect to the alleged Manufacturers' Enterprises, B.A.T. contends that it could not have directed any of the RICO enterprises (e.g., the CTR, the TI, or the STC) because it was not a named member of or direct participant in these groups. *See Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ("In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs"). B.A.T.'s active direction of Brown & Williamson's fraudulent conduct, however, is sufficient to raise a material question for the jury as to whether B.A.T. was, at a minimum, indirectly and knowingly involved in orchestrating or directing the affairs of the Manufacturers' Enterprises. A parent corporation such as B.A.T. cannot avoid RICO liability merely by acting through a subsidiary when undertaking or engaging in a racketeering scheme with others. Summary judgment for B.A.T. on the Manufacturers' Enterprises is denied.

As to the B.A.T. Enterprise, however, summary judgment is warranted. The B.A.T. Enterprise only consists of B.A.T., BATCo, Brown & Williamson, and other B.A.T. subsidiaries. The court of appeals for the Second Circuit has instructed that section 1962(c) " 'clearly envisions' that the 'person' and the 'enterprise' will be distinct" and that this requirement is not satisfied where the RICO enterprise alleged is *merely* the parent corporation and its wholly owned subsidiaries, and the defendant is the parent corporation. *See Discon,* 93 F.3d at 1063–64. Because defendant B.A.T. has proffered evidence that B.A.T. and its subsidiaries (including Brown & Williamson) operated within a generally unified corporate structure and were guided by a single corporate consciousness, and because Empire has proffered no material evidence to the contrary, B.A.T. cannot be held liable under RICO for the B.A.T. Enterprise; the requirement that the enterprise and the defendant be distinct is not satisfied.

B. Section 1962(c)

Empire pleads section 1962(c) actions both as direct claims (e.g., the RICO Smoking–Reduction Action and the RICO Payment Action) and in equitable subrogation (e.g., the Subrogated Rico Payment Action).

1. Direct Claims

■ Recovery under civil RICO requires a plaintiff to establish injury to business or property "by reason of" the alleged racketeering activity. 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 ... may sue therefore in any appropriate United States district court ...."); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[A] plaintiff only has standing if, and can only recover to the

extent that, he has been injured in his business or property *by the conduct constituting the violation.*" (emphasis added)). This language has been understood as requiring both factual (i.e., "but for") and proximate causation. *See, e.g., Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (proximate causation); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1314 (2d Cir.1990) (factual causation).

### a. Causation–In–Fact: Reliance

A plaintiff alleging predicate acts sounding in fraud—such as those instances of mail fraud and wire fraud alleged by Empire here—must prove justifiable detrimental reliance to establish factual causation. *See Metromedia Co. v. Fugazy,* 983 F.2d 350, 368 (2d Cir.1992) ("to establish the required causal connection, the plaintiff [must] ... demonstrate that the defendant's misrepresentations were relied on."); *see also Appletree Square I v. W.R. Grace & Co.,* 29 F.3d 1283, 1286 (8th Cir. 1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts."); *see generally* Arthur F. Mathews, Andrew B. Weissman & John H. Sturc, 2 *Civil RICO Litigation* § 8.04[B][1], at 8–45 (2d ed. 1992) ("[T]he concept of reliance enters the picture in civil RICO because of its relationship to the injury causation requirement, not as an element required to prove the predicate acts.").

Reliance can be established in one of two ways. A plaintiff may establish direct reliance if he was the target of the fraudulent conduct; that is, the plaintiff may allege that he himself detrimentally relied on the underlying misrepresentations. Empire's RICO Smoking Reduction Action asserts a direct reliance chain of causation.

Alternatively, a plaintiff may establish third-party reliance. This may be done by showing that "his injuries were indirectly but proximately caused by a fraudulent scheme directed at third parties, that is to say, the third parties' reliance on the underlying misrepresentations." *Sterling Interiors Group, Inc. v. Haworth, Inc.,* Civ. No. 94–9216, 1996 WL 537482, at * 4 (S.D.N.Y. Sept.23, 1996); *see, e.g., County of Suffolk,* 907 F.2d at 1311 (third-party reliance). Empire's RICO Payment Action is based on a third-party reliance chain of causation.

Empire's RICO Smoking Reduction Action fails as a matter of law. Even assuming for arguments sake that Empire actually relied on Tobacco's alleged fraudulent campaign to deny the health effects of smoking, such reliance would not have been reasonable or justifiable given Empire's status within the healthcare industry and its corporate sophistication. *See* W. Page Keeton et al., *Prosser and Keeton on Torts* § 108, at 749 (5th ed. 1984) ("Not only must there be reliance but the reliance must be justifiable under the circumstances." (footnote omitted)); *see also A Concise Restatement of Torts* § 537, at 122 (Kenneth S. Abraham & Albert Clark Tate, Jr.2000) (general rule of justifiable reliance).

It is untenable to suppose that Empire was a "simple" or naive entity that was easily "boondoggled" and "duped" by Tobacco's conduct. Rather, Empire is a worldly-wise health insurance provider that reasonably should have investigated and accessed the deleterious health effects of smoking. *Cf. LeBlanc v. Cahill,* 153 F.3d 134, 148–49 (4th Cir.1998) (pension fund's "fraud claim fail[ed] as a matter of law[ ] because no reasonable juror could find justifiable reliance on the [defendants'] statements and omissions in investing fifteen million dollars" given that it was "a sophisticated business entity with considerable experience in evaluating investment opportunities"); *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.,* 132 F.3d 1017 (4th Cir.1997) (rejecting argument that plaintiff bank was "unsophisticated in [collateralized mortgage obligations] in-

vestments" so as to create a genuine issue as to justifiable reliance). Empire had the capacity to learn the health effects of smoking through the experience and research of its large corps of doctors, biotechnicians, and other health care experts. It also had a strong financial interest in discovering those effects, particularly given its need to ensure that revenues from health care premiums sufficiently covered eventual healthcare outlays. Finally, Empire—as a direct provider of medical services presumably with first-hand information on the negative health effects of smoking—had the opportunity to catalogue and study the rates and patterns of injuries being suffered by smokers. *Cf. generally Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 737–38 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."). Summary judgment as to Empire's RICO Smoking Reduction Action is accordingly appropriate.

■ With respect to the RICO Payment Action, defendants have not challenged Empire's proffered proof of reliance. *See, e.g.,* Expert Report of Jeffrey E. Harris M.D., Ph.D., Nov. 29, 1999, at 35–49 ("Harris Report") (quantifying the injury caused by defendants' alleged improper conduct). Nonetheless, it deserves stating that Empire need not establish specific reliance by each Plan member to satisfy the necessary reliance showing. As was held in *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 335 (E.D.N.Y.2000):

> Though reliance is a requirement for establishing causation where predicate acts based in fraud are alleged, the nature of the reliance is not a constant. Where the fraudulent scheme is limited in scope and specifically targeted at only one or a few individuals, organizations, or entities, the establishment of causa-

tion should require reliance on identifiable misrepresentations.

> Where, however, the fraudulent scheme is targeted broadly at a large population of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people.

*Id.*

The fraudulent scheme perpetrated by Tobacco was, if Empire's allegations supporting the RICO Payment Action are borne out, a massive conspiracy intentionally carried out through indirect channels of communication, such as the media, targeting the entire body of public knowledge in an effort to undermine accurate public understanding of the addictive and injurious effects of smoking. To require individual showings of reliance in such instances would unduly restrict RICO's reach with respect to the most massive fraudulent schemes: those that are so large and intricate that they successfully co-opt the entire body of public knowledge through the use (and abuse) of multiple avenues of communication. Such a restrictive approach in enforcing civil-RICO would unnecessarily provide a safe harbor for those guilty of massive and insidious frauds that can potentially injure millions.

■ Where such broad-based fraudulent schemes are alleged and sufficient evidence is proffered at the summary judgment stage, a plaintiff may show reliance by establishing (1) that the RICO defendants intentionally engaged in a scheme to distort the body of public knowledge, (2) that the defendants were successful in doing so (e.g., a substantial factor in causing the distortion), (3) that there was detrimental reliance on this distorted information by an intended and foreseeable class of victims, (4) that such reliance was reasonable in the totality of the circumstances, and (5) that the plaintiff was

proximately injured by this reliance. *See Falise*, 94 F.Supp.2d at 335; *cf. generally Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("fraud on the market").

At this stage, Empire has come forward with sufficient evidence to demonstrate reliance. The allegations in the complaint and the supporting evidentiary materials proffered by plaintiffs (as partially outlined in the discussion of facts, Part II. B.2., *supra*) raise material questions of fact as to whether Tobacco intentionally sought to mislead the public about the health effects of smoking and whether Tobacco was actually successful in doing so. The 220 individual smoker-Plan members' depositions indicating smoker reliance on defendants' misrepresentations and omissions, together with the statistical analysis of smoking initiation and quit rates undertaken by Dr. Jeffrey Harris on behalf of Empire, is sufficient to raise triable questions of fact regarding detrimental reliance by Plan members, including whether reliance on Tobacco's alleged misinformation was reasonable under the totality of the circumstances.

There is no inconsistency between allowing Empire to sue based on the misleading of its Plan members who smoked while ruling that Empire itself should not have relied on Tobacco's misinformation. Empire could not compel its clients not to smoke, nor could it be responsible for their personal life choices. Forcing smokers off its rolls would have only compounded the cruelty of their being misled.

### b. Proximate Causation

Defendants seek summary judgment on Empire's RICO Payment Action arguing that proximate cause is lacking. *See, e.g., Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir.1999), *superseding* 172 F.3d 223 (2d Cir.1999). This contention has already been considered and rejected in three earlier opinions demonstrating why *Laborers Local 17* is not directly applicable. *See, e.g., National Asbestos Workers Med.*

*Fund. v. Philip Morris*, 74 F.Supp.2d 221, 224–38 (E.D.N.Y.1999); *National Asbestos Workers Med. Fund. v. Philip Morris, Inc.*, 74 F.Supp.2d 213, 216–20 (E.D.N.Y. 1999); *Blue Cross & Blue Shield of N.J. v. Philip Morris*, 36 F.Supp.2d 560, 568–85 (E.D.N.Y.1999). No new arguments have been advanced with respect to Empire to undermine that conclusion.

Defendants' singular reliance on the ultimate holding by the court of appeals for the Second Circuit in *Laborers Local 17*— a case in which the court considered the issue of proximate cause on interlocutory review in an action by a labor union health fund without the benefit of substantial pretrial discovery—is misplaced. As the Supreme Court itself stated in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 536–37, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983):

> [T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances.

*Id.* (proximate causation under Sherman Antitrust Act). The court of appeals in *Laborers Local 17* itself emphasized the need to independently analyze the facts of each case, declaring: "'the infinite variety of claims that may arise' [under civil RICO] make it virtually impossible to announce a black-letter rule [regarding proximate causation]." *Laborers Local 17*, 191 F.3d at 239, n. 4.

In this court's last consideration of the proximate cause issue it concluded: "[t]he Blues are not simply traditional insurers which passively receive premiums for the purpose of allocating risk [as the plaintiffs in *Laborers Local 17* were assumed to be]." *National Asbestos Workers Med. Fund*, 74 F.Supp.2d at 226. Rather, the Blues "play a far more active and direct

role in the provision of health care to the general public[.]" *Id.* The active role played by Empire and the other Blues throughout their history in providing medical care to the nation's population as well as other unique features of the Blues prevent the holding in *Laborers Local 17* from being dispositive here. *See, e.g., National Asbestos Workers Medical Fund v. Philip Morris,* 71 F.Supp.2d 139, 167 (E.D.N.Y. 1999) ("[W]hile there may be some similarities with the plaintiffs in *Laborers Local 17,* there are also significant differences between the operation and role of the Blues in the delivery of this country's health care services that could support the conclusion that injury to the Blues was a proximate result of Tobacco's alleged conduct."); *see generally* William Keeton et al., *Prosser & Keeton on the Law of Torts* § 42, at 279 (5th ed. 1984) ("[P]roximate cause is always to be determined *on the facts of each case* upon mixed considerations of logic, common sense, justice, policy and precedent." (emphasis added)).

Defendants' motion for summary judgment with respect to Empire's RICO Payment Action for lack of proximate cause is denied. At the trial reconsideration of the proximate cause question will be appropriate.

### 2. Subrogated Claims

Defendants challenge Empire's Subrogated RICO Payment Action on four grounds. First, defendants contend that mass subrogation claims deny them their constitutional rights to due process and to a jury trial. *See* U.S. Const. amend. v. (due process); *id.* amend. VII (jury trial). Second, they complain that treble recovery under civil RICO is inconsistent with the equitable principles underlying subrogation actions. Third, they allege that adjudication of the Subrogated RICO Payment Action requires the resolution of questions of reliance and periods of limitations that they argue can not be properly addressed without individual adjudication for each of hundreds-of-thousands of subrogated claims of Empire. Fourth, the defendants argue that the claims of Empire are barred under New York law. *See* N.Y. CPLR 4545(c).

### a. Constitutional Challenges

Tobacco's attack on the Subrogated RICO Payment Action centers on the anticipated use by plaintiffs of statistical methods of proof to establish injury. *See* Harris Report, *supra,* at 31–56 (statistical analysis of what proportion of the Blues' smoking-attributable expenses for the period 1954–2009 were or will be attributable to Tobacco's alleged improper conduct).

■■■ The use of statistical evidence and methods in the American justice system to establish liability and damages is appropriate, particularly in mass injury cases such as this one. *See, e.g., In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1019–20 (5th Cir.1997) (use of statistics to draw inferences about the claims of 3,000 plaintiffs and intervenors who claimed wrongful death, personal injury, and property contamination from defendant's storage of hazardous substances which had leaked from crude oil waste pits and migrated into the plaintiffs' drinking water supply). *But see Hilao v. Estate of Marcos,* 103 F.3d 767, 788 (9th Cir.1996) (Rymer, J., dissenting) ("I cannot believe that a summary review of transcripts of a selected sample of victims who were able to be deposed for the purpose of inferring the type of abuse, by whom it was inflicted, and the amount of damages proximately caused thereby, comports with fundamental notions of due process."); *In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir. 1990) ("[T]he *assumption* of plaintiffs' argument is that its proof of omnibus damages is in fact achievable; that statistical measures of representativeness and commonality will be sufficient for the jury to make informed judgments concerning damages").

Reliance on statistical methods has been required by the profound evolution that our economic system has experienced in recent decades. *See generally* Deborah R.

Hensler & Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A SocioLegal Analysis,* 59 Brook. L.Rev. 961 (1992).

American manufacturers now·mass produce goods for consumption by millions using new chemical compounds and processes, creating the potential for mass injury. Modern adjudicatory tools must be adopted to allow the fair, efficient, effective and responsive resolution of the claims of these injured masses. *See, e.g., In re DES Cases,* 789 F.Supp. 548 (E.D.N.Y. 1992) (market share liability applied in suits for defective design of diethylstilbestrol (DES)); *In re Joint Eastern and Southern District Asbestos Litig.,* 726 F.Supp. 426 (E.&S.D.N.Y.1989) (computation of damages for Brooklyn Navy Yard asbestos victims); *In re "Agent Orange" Product Liability Litig.,* 689 F.Supp. 1250 (E.D.N.Y.1988) (distribution scheme for victims of agent orange); *see also Manual for Complex Litigation* § 33.21–29 (3d ed.1995) (mass torts); *see generally* Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice,* 87 Geo. L.J. 1983, 1986 (2000) ("[R]ecent trends in mass tort litigation may hint at an evolution toward greater use of inquisitorial tools within the context of the U.S. adversary system."); Kenneth R. Feinberg, *Lawyering in ·Mass Torts,* 97 Colum. L.Rev. 2177, 2177 ("mass torts [litigation] requires more than the traditional view of lawyering ...."); *cf. generally* Richard A. Nagareda, *In the Aftermatch of the Mass Tort Class Action,* 85 Geo. L.J. 295 (1996).

Against this backdrop, the use of statistical evidence violates neither the constitutional guarantee of due process nor the constitutional right to a jury trial. ·*See generally In re Chevron U.S.A., Inc.,* 109 F.3d at 1020 ("[t]he applicability of inferential statistics have long been recognized by courts"; collecting cases); Laurens Walker & John Monahan, *Sampling Damages,* 83 Iowa L.Rev. 545 (1998) ("[A] complete solution of the numbers problem in mass torts can only be achieved by ...

randomly sampling damages without apology."); *cf. generally In re Matter of Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1304 (7th Cir.1995) (noting with approval idea of a "sample of trials"); *Malcolm v. National Gypsum, Co.,* 995 F.2d 346, 355 (2d Cir.1993) (Walker, J., dissenting) ("Consolidated trials are an indispensable means of resolving the thousands of asbestos claims flooding our state and federal courts, as well as claims arising from other types of mass torts").

### i. Due Process

" 'Due Process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) ("The very nature of· due process negates any concept of inflexible procedures universally applicable to every imaginable situation"). Whether a procedural device utilized where a private party invokes state authority to deprive another person or entity of property comports with due process is determined by a balancing of interests:

> [F]irst, consideration of the private interest that will be affected by the [procedure]·; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, ... principal attention to the interest of the party seeking the [procedure], with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections.

*Connecticut v. Doehr,* 501 U.S. 1, 11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (citing *Mathews v. Eldrige,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); *see Hilao,* 103 F.3d at 786.

Consideration of the private interests at issue counsels in favor of utilizing statistical methods. Tobacco admittedly

has an interest in not paying for damages in excess of what its alleged misconduct may have caused; that interest would be furthered by Tobacco's confronting (before the jury) each of the hundreds of thousands of Empire's insured who suffered smoking-related illnesses about their reliance on Tobacco's misstatements and omissions, and about their discovery of their injuries (so as to precisely determine in each instance when the statute of limitations started to run).

Practical considerations temper the weight of Tobacco's interest, however. If such a process were undertaken, it would have to continue beyond all lives in being. Assuming Tobacco was willing to expend the resources and monies necessary both in discovery and at trial to mount such an undertaking, the litigation costs in doing so would far exceed any monies saved by avoiding erroneous payments given Empire's four year limitation on recovery. *See infra* Part IV.B.3. (limiting recovery to claims filed with Empire to four years prior to commencement of this action—April 29, 1994).

The interest of Empire in avoiding the additional litigation costs that would arise if Tobacco was permitted to confront each Plan member at trial is enormous, particularly since Empire is presently a nonprofit entity with limited annual income appropriately dedicated to covering Plan members' health care costs. The necessary additional litigation costs Empire would have to bear would consume much of any recovery from Tobacco, making continued pursuit of the litigation fruitless. *See, e.g., Hilao,* 103 F.3d at 786 ("[Plaintiffs'] interest in the use of the statistical method . . . is enormous[ ] since adversarial resolution of each class member's claim would pose insurmountable practical hurdles.").

The interests of the injured smoking Plan members must be considered. Requiring individual proof as to each claim would unnecessarily intrude on the lives of hundreds of thousands of people. Examining each of the grains of sand on the beach is too burdensome.

The second element of the due process balancing test—examination of the risk of erroneous · deprivation through the procedures under attack and the probable value of additional or alternative safeguards—also supports allowance of the proffered statistical proof, subject to appropriate *Daubert* challenges. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Falise v. American Tobacco Co.,* 107 F.Supp.2d 200 (E.D.N.Y.2000); *cf. International Bhd. Of Teamsters, Local 734 v. Philip Morris Inc.,* 196 F.3d 818, 823 (7th Cir.1999) ("Statistical methods could provide a decent answer—*likely a more accurate answer than is possible when addressing the equivalent causation question in a single person's suit.*" (emphasis added)).

The parties have been permitted to take depositions and conduct discovery of a sufficient sample of Empire's Plan members who suffered smoking-related injuries to yield statistically significant conclusions. *See* Michael O. Finkelstein & Bruce Levin, *Statistics for Lawyers* § 5.6–5.12, at 170–86 (1990) (confidence intervals); *id.* § 9.1–9.8, at 258–83 (sampling); *id.* § 12.1–12.37, at 323–464 (1990) (regression modeling); David H. Kaye and David A. Freedman, *Reference Guide on Statistics, in Reference Manual, supra,* at 331; Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in Reference Manual, supra,* at 415; *see generally* Geoffrey R. Norman & David L. Streiner, *PDQ Statistics* 27–77 (1986) (statistical inference and regression analysis). It is plaintiff's well supported contention that this will ensure that the ultimate damages projected by its statistical model will be within 10 percent (either higher or lower) of the actual damage caused by Tobacco's alleged misconduct.

In addition to statistical evidence, parties will be permitted to present to the jury relevant lay testimony, expert testimony, and documentary evidence—subject

to the constraints of the Federal Rules of Evidence and the practical considerations of trial management.

The third due process consideration—regard for any interest the government may have in procedures—heavily weighs in support of allowing Empire to rely on statistical evidence. A consolidated trial with full presentation of the individual facts of each of Empire's subrogated claims relating to smoking-related illnesses before a single jury would be unmanageable. *See Manual for Complex Litigation* § 22.3, at 136 ("Although the presentation of the evidence at trial is normally controlled by the strategies and tactics of counsel, in complex litigation other considerations also require attention, primarily jury comprehension and the length of the trial. These are not unrelated concepts, since a shorter trial promotes jury comprehension, and effective presentation saves times."); Joe S. Cecil, Valerie P. Hans & Elizabeth C. Wiggins, *Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials,* 40 Am. U. L.Rev. 727, 750–764 (1991) ("[T]he overall picture of the jury [in complex cases] that emerges from the available data indicates that juries are capable of deciding even very complex cases, *especially if procedures to enhance jury competence are used.*" (emphasis added)). Similarly, hundreds-of-thousands of separate trials brought by Empire to adjudicate individually the subrogation claim arising from each Plan member who has suffered a smoking-related illness would prove unnecessarily burdensome; it would "clog the docket of the district court for years." *Hilao,* 103 F.3d at 786–87; *see also* Laurens Walker & John Monahan, *Sampling Liability,* 85 Va. L.Rev. 329, 343 (1999) ("Individualized information should be used where it is practical—i.e., cost effective—to obtain. If individual information is not practical to obtain, however, sampling should be used so that a judgment can be reached efficiently and expeditiously.").

Under the balancing test set forth in *Doehr,* the use of statistical evidence (subject to satisfaction of the *Daubert* criteria) by Empire does not violate due process strictures. *See* Michael J. Saks & Peter David Blanck, *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts,* 44 Stan. L.Rev. 815, 826–832 (1992) (statistical sampling comports with due process in mass aggregation cases).

### ii Jury Right

■ In addition to their due process challenge, defendants contend the use of statistical proof violates their constitutional rights because such proof is inconsistent with the Seventh Amendment guarantee of a jury trial. As support for this proposition, defendants rely on a pair of decisions from the court of appeals for the Fifth Circuit: *Cimino v. Raymark Indus.,* 151 F.3d 297 (5th Cir.1998); and *In re Fibreboard Corp.,* 893 F.2d 706 (5th Cir.1990). Neither decision stands for the proposition that defendants cite them for: that the use of statistical proof *by a plaintiff* to establish *its own* multiple injuries violates the Seventh Amendment.

*Cimino* and *Fibreboard* are *class actions.* The concern in both decisions was the district courts' proposed use in each case of a limited number of representative trials to decide questions of Texas law for all class members. In both cases the court of appeals believed that such trial plans are inconsistent with the *Texas' state law requirement* of separate showings of causation and damage *by each plaintiff* (a concern rooted in the *Erie* doctrine). *See id.* at 711 ("The[ ] elements [of Texas's product liability law] focus upon individuals, not groups"); *cf. generally Castano v. American Tobacco Co.,* 84 F.3d 734, 747 (5th Cir.1996) (class action trial structure which divided questions of causation and comparative negligence between separate juries held inconsistent with Reexamination Clause of Seventh Amendment); *In the Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir.1995) (class

action trial structure which divided questions of proximate causation and comparative negligence between separate juries held inconsistent with Reexamination Clause of Seventh Amendment). *But cf. generally Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1232 (9th Cir.1996) (declining to adopt *Rhone–Poulenc* rationale); *In re Copley Pharm., Inc. Albuterol Products Liability Litig.,* 161 F.R.D. 456 460–61 (D.Wyo.1995) (same).

Accepting for arguments sake the conclusions reached by the court of appeals for the Fifth Circuit in *Cimino* and *Fibreboard*—that the right to a jury is violated by the use of statistics to extrapolate findings of liability from a group of representative plaintiffs to all plaintiffs (in place of individual jury verdicts as to each plaintiff)—that question is not presented here. The present case does not arise in the posture of *Cimino* and *Fibreboard.* It involves non-class claims of a single plaintiff against five defendants. Empire is advancing its own subrogated interests; no representative group of plaintiffs have been selected to litigate *from whose verdicts liability determinations will be extrapolated to the remaining plaintiffs. See, e.g., United States v. Aetna Cas. & Surety Co.,* 338 U.S. 366, 379, 70 S.Ct. 207, 94 L.Ed. 171 (1949) ("Both the insured and the insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest").

To accept defendants' contention that the aggregation of Empire's subrogation claims violates the Seventh Amendment would require concluding that the Amendment establishes fixed limitations on the methods of proof a *particular party* may offer in support of *its own claims.* Neither *Cimino* nor *Fibreboard* stand for this untenable proposition. Such a ruling would run contrary to decades of federal law in areas such as employment, copyright and patent law where the use of statistical evidence is common. *See, e.g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statisti-

cal data to prove discrimination in jury selection); *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670 (S.D.N.Y.1963) (Feinberg, J.) (survey data in trademark infringement case).

There is no valid basis for dismissal of the Subrogation RICO Payment Action under the Seventh Amendment. Summary judgment on this grounds is denied.

### b. State Law Challenges

Defendants assert a number of state law grounds for dismissal of the Subrogated RICO Payment Action.

### i. Federal Common Law v. New York Law

Although Empire's Subrogation RICO Payment Action is based on a federal cause of action, specifically section 1964(d) of Title 18 creating civil RICO, the right of equitable subrogation that allows Empire to "stand in the shoes" of its insured in a civil RICO is determined by state law. *See, e.g., Nicolls Pointing Coulson, Ltd. v. Transportation Underwriters of La., Inc.,* 777 F.Supp. 493, 494–97 (E.D.La.1991) (RICO claims are assignable but assignment was ineffective under Louisiana law); *cf. Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 258 (2d Cir.1999) ("The doctrine of equitable subrogation allows insurers to 'stand in the shoes' of their insured to seek indemnification by pursuing any claims that the insured may have had against third parties legally responsible for the loss."); 2 Allan D. Windt, *Insurance Claims and Disputes* § 10.05 (1995) ("Subrogation is the right one party has against a third party following payment, in whole or in part, of a legal obligation that ought to have been met by the third party").

Empire seeks adoption and application of a *nationally uniform* federal rule of equitable subrogation for civil RICO actions. *But cf. Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 98–99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (federal courts developing federal common law under Investment Company Act of 1940 should use the law of the particular state

of incorporation); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) ("Controversies directly affecting the operations of federal programs, although governed by federal law, *do not inevitably require resort to uniform federal rules*." (emphasis added)). Because civil RICO itself is silent as to subrogated claims, acceptance of plaintiff's argument would require this court to conclude that (1) a *federal common-law scheme of equitable subrogation* for civil RICO is appropriate—that is, that state law does not create the equitable subrogation rights under civil RICO but rather that the statute itself creates such rights—and (2) that a uniform national rule for RICO subrogation is warranted.

 Even assuming for arguments sake, without deciding, that civil RICO *as a matter of federal law* embodies a right of equitable subrogation (as opposed to being a state created right), departure from state law principles of equitable subrogation would nonetheless be unwarranted. As the Supreme Court has instructed, "[t]he scope of a federal right is, of course, a federal question, *but that does not mean that its content is not to be determined by state, rather than federal law*." *DeSylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) (emphasis added). Uniform federal common law rules of decision are not to be created where (1) "there is little need for a nationally uniform body of law," (2) "application of state law would [not] frustrate specific objectives of the federal program[ ]," and (3) application of a uniform "federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. 1448.

 Consideration of these factors suggests that state law principles appropriately govern the substance of a third party payor's equitable subrogation rights under civil RICO. With respect to the first two factors, Empire has not identified an overriding federal interest in a uniform rule of civil RICO subrogation, nor has it indicated how application of divergent state principles of equitable subrogation in this case would frustrate civil RICO's objectives. *Cf. Miree v. DeKalb County, Georgia*, 433 U.S. 25, 31, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (no showing that application of state law would frustrate the federal interests in aviation safety; in suits between private parties, resort to federal common law is appropriate only where there is a "*significant conflict* between some federal policy or interest and the use of state law" (emphasis added)). What is apparent is that adoption of a uniform federal rule of equitable subrogation for civil RICO would disrupt well established legal and economic relationships that have long been predicated on New York state law. *See, e.g., Kamen*, 500 U.S. at 98–99, 111 S.Ct. 1711 (corporate law is a matter of state concern and should not be deviated from); *Kimbell Foods*, 440 U.S. at 739, 99 S.Ct. 1448 ("In structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved. However, subjecting federal contractual liens to the doctrines developed in the tax lien area could undermine that stability. Creditors who justifiably rely on state law to obtain superior liens would have their expectations thwarted whenever a federal contractual security interest suddenly appeared and took precedence."). *Cf. generally* Linda S. Mullenix, *Class Resolution of the Mass–Tort Case: A Proposed Federal Procedure Act*, 64 Tex. L.Rev. 1039 (1986) (arguing for legislation to extend the power of making federal common-law to mass torts).

In short, whatever the source of equitable subrogation rights under civil RICO—federal or state law—reversion to state law principles to determine the content of that right is appropriate.

As a matter of state choice of law, New York's law of subrogation governs the scope of Empire's subrogated RICO claims given that a substantial portion of the alleged misconduct occurred in New York,

Empire's injured Plan members primarily resided in New York, and Empire is a New York corporation. *See, e.g., Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 353–54 (E.D.N.Y.2000) ("New York has the greatest interest in ensuring the solvency of the [Manville] Trust and in preventing fraudulent conduct of others from eroding the Trust's corpus."); *Bergeron v. Philip Morris, Inc.,* 100 F.Supp.2d 164, 170 (E.D.N.Y.2000) ("[A] return to the bedrock principle announced in *Babcock [v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (Fuld, C.J.) ]—that 'controlling effect [should] be given to the law of the jurisdiction which has the greatest interest in the specific issues raised in the litigation'—is warranted [with respect to alleged worldwide conspiracies].").

### ii Treble Recovery

Defendants seek to strike Empire's request for treble damages under the Subrogated RICO Payment Action, contending that subrogation is intended only to indemnify or reimburse, not to enrich, and that trebling of Empire's subrogated damages would constitute a windfall.

Under New York law, subrogation is a creature of equity; it does "not arise from, nor is it dependent upon, statute or the terms of the contract of insurance." *Gibbs. v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 106 (2d Cir.1992). An insurer's right to subrogation attaches as a matter of equity at the time an insured's costs or losses are paid. *Id.*

Pursuant to New York's doctrine of equitable subrogation, payment by Empire for health care costs of its Plan members gave rise to subrogated claims for any viable causes of action—and any recovery rights accompanying those actions—the Plan members had against Tobacco. As the court of appeals for the Second Circuit stated in *Gibbs:* "At [the time of paying an insured's loss], the insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, and the insurer

succeeds to all the procedural rights *and remedies possessed by the insured." Gibbs,* 966 F.2d at 106 (emphasis added).

In the present case, the "corresponding amount" that Empire "stands in the shoes" of Plan members for is the amount actually expended for health care costs, but in becoming subrogated for that share Empire also succeeded to the statutorily provided remedy rights which accompany that amount. Part of the remedy rights provided under civil RICO is a right to trebling of any award of damages. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] ... may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."). With respect to Empire's Subrogated RICO Payment Action, the health care costs which it has paid and therefore became subrogated for have entitled it, should a jury find in its favor, to a corresponding right to trebling of the amount of its subrogated loss. *Cf. Cullen v. Margiotta,* 811 F.2d 698 (2d Cir.1987) ("civil RICO requires that a successful plaintiff be awarded treble damages").

To prohibit the trebling of damages in cases of equitable subrogation—where trebling is otherwise permitted as a matter of congressional intent as a remedy for the underlying cause-of-action—would have the effect of unjustly enriching the injuring party. *See Teichman v. Community Hospital of Western Suffolk,* 87 N.Y.2d 514, 521, 640 N.Y.S.2d 472, 663 N.E.2d 628 (1996) (equitable subrogation "formulated to prevent unjust enrichment"). If such a rule were adopted, the injuring party would essentially avoid much of the damages for which it is statutorily obligated merely because the amount of losses in question had been covered by a third party. This outcome would conflict with the basic notion of subrogation as a tool "designed to dispense equity and justice among the parties." *See Federal Ins. Co.,*

75 N.Y.2d at 376, 553 N.Y.S.2d 291, 552 N.E.2d 870.

Defendants' reliance on contractual provisions in Empire's health plans that provide recovery rights only "to the extent of the benefits [Empire] paid" is misplaced. Empire is not suing under a contractual subrogation right, but is suing in equitable subrogation. *See Federal Ins. Co.*, 75 N.Y.2d at 372, 553 N.Y.S.2d 291, 552 N.E.2d 870 ("Unlike contractual subrogation where the subrogee's rights are defined in an express agreement between the insurer-subrogee and the insured-subrogor, the rights of an insurer against a third party as equitable subrogee arise independently of any agreement." (citing *American Sur. Co. v. Palmer*, 240 N.Y. 63, 67, 147 N.E. 359 (1925))). Any limits on Empire's contractual subrogation rights therefore are irrelevant here.

### iii Aggregate Adjudication

Defendants also seek dismissal of the Subrogated RICO Payment Action contending that resolution of questions of reliance and periods of limitations can not be properly addressed without individual adjudication for each of the hundreds-of-thousands of subrogated claims.

Whether the necessary evidentiary showing the Blues must make to recover under their Subrogated RICO Payment Action—e.g., individualized proof on a claim-by-claim basis or statistical evidence from a statistically significant sample—is governed by federal law or New York law is unclear. *See generally* Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 6(D), at 44–45 (2d ed.2000) (assignability and subrogation of RICO claims). This issue need not be resolved since there appears no basis under either body of law why statistical evidence should be prohibited.

The New York Court of Appeals has expressly instructed that the overriding purpose behind the doctrine of equitable subrogation is to "dispense equity and justice among the parties." *Federal Ins. Co.*

*v. Arthur Andersen & Co.*, 75 N.Y.2d 366, 376, 553 N.Y.S.2d 291, 552 N.E.2d 870 (1990) (internal quotation marks omitted); *see id.* at 378, 553 N.Y.S.2d 291, 552 N.E.2d 870 (equitable subrogation is "the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity and good conscience out to pay it." (internal quotation marks omitted)); *King v. Pelkofski*, 20 N.Y.2d 326, 334, 282 N.Y.S.2d 753, 229 N.E.2d 435 (1967) (equitable subrogation prevents unjust enrichment). In *Ocean Accident & Guarantee Corp. v. Hooker Electrochemical Co.*, 240 N.Y. 37, 47, 147 N.E. 351 (1925), the court reasoned:

> [The] right of subrogation is based upon principles of equity and natural justice. We recognized at once the fairness of the proposition that an insurer, who has been compelled by his contract to pay for damages, ought to be reimbursed by the party whose fault has caused such damages, and *the principle of subrogation ought to be liberally applied for the protection of those who are its natural beneficiaries.*

*Id.* (emphasis added); *see Federal Ins. Co.*, 75 N.Y.2d 366, 373, 553 N.Y.S.2d 291, 552 N.E.2d 870 (1990) ("[T]he principles of subrogation ought to be liberally applied to the protection of those who are its natural beneficiaries." (internal quotation marks omitted)); *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 260 (2d Cir.1999) (same).

Fidelity to the equitable principles underlying New York's doctrine of subrogation in this instance permits the use of statistical proof rather than compelling individualized showings as to hundreds-of-thousands of claims. *See Kozlowski v. Briggs Leasing Corp.*, 96 Misc.2d 337, 408 N.Y.S.2d 1001, 1005 (N.Y.Sup.Ct.1978) ("Equity regards substance rather than form." (quoting *Pezenik v. Greenberg*, 251 A.D. 866, 296 N.Y.S. 916, 917 (2d Dept. 1937))). *But see Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F.Supp.2d 236, 246 (D.Mass.1999).

The equity in allowing statistical proof of reliance and causation on the Subrogated RICO Payment Action is underscored by the massive nature of the fraud alleged: if Empire's allegations are borne out, the defendants sought to mislead the whole of the American public by distorting the entire body of public knowledge on the lethal and addictive effects of smoking. By carrying out this alleged widespread scheme, it was the defendants themselves who made a claim-by-claim showing virtually impossible.

The motion for summary judgment on the Subrogated RICO Payment Action for lack of individualized proof as to each of Empire's subrogated injuries is denied. This motion may be renewed following the forthcoming *Daubert* hearings.

### iv N.Y. CPLR 4545(c)

Defendants also seek summary judgment of the Subrogated RICO Payment Action alleging that recovery by Empire is barred by section 4545(c) of New York's Civil Practice Law and Rules. CPLR 4545(c) is a collateral source rule. It provides that "[i]n any action brought to recover damages for personal injury ... where the plaintiff seeks to recover for the cost of medical care" the plaintiff's award shall be reduced to the extent that any cost it compensates for was "replaced or indemnified ... from any collateral source such as insurance[.]" Defendants argue that because the insured could not recover health care expenditures paid on their behalf by Empire, Empire is itself in turn foreclosed from recovering, since according to defendants recovery under subrogation cannot be any more than the insureds' rights of recovery. *But see Kelly v. Seager*, 163 A.D.2d 877, 558 N.Y.S.2d 403 (4th Dept.1990) ("[P]urpose [of CPLR 4545(c)] would not be served by its application to subrogation claims").

In advancing this argument, defendants rely on *Humbach v. Goldstein*, 229 A.D.2d 64, 653 N.Y.S.2d 950 (2d Dept.1997). *Humbach* involved an insurance company seeking to intervene in a suit brought by the insured against various tort-feasors; the insurance company was seeking reimbursement for the insured's medical expenses that it had paid. *Id.* at 951.

To the extent that *Humbach* can be understood as limiting the ability of insurance providers to recover medical costs in equitable subrogation actions, it is inconsistent with the general body of law on equitable subrogation. *See, e.g., Berry v. St. Peter's Hosp. of the City of Albany*, 173 Misc.2d 214, 660 N.Y.S.2d 795, 801 (N.Y.Sup.Ct.1997), *aff'd in part and rev'd in part by* 250 A.D.2d 63, 678 N.Y.S.2d 674 (3d Dept.1998); *see also Teichman v. Community Hosp. of Western Suffolk*, 640 N.Y.S.2d at 476–77, 663 N.E.2d 628; *Nossoughi v. Federated Dept. Stores, Inc.*, 175 Misc.2d 585, 669 N.Y.S.2d 479, 481–82 (N.Y.Sup.Ct.1998). Judge Lehner's reasoning and conclusion in *Nossoughi* (decided after *Humbach*) properly reflect New York law:

> Since the principle purpose of CPLR 4545 was to modify the common law collateral source rule as to prohibit a double recovery, permitting the health insurer to recover [in equitable subrogation] its out-of-pocket expenses from the tortfeasor's insurer [or the tortfeasor] does not violate such intent as the claims of the subrogee are separate and distinct from those of the subrogor, being "divisible and independent."

*Nossoughi*, 669 N.Y.S.2d at 482 (citations omitted); *see also id.* ("Moreover, since CPLR 4545 may be considered a derogation of common law principles, it should receive a strict interpretation so as to limit the change in common law only to the clear meaning of the words used." (citations omitted)).

Defendants' motion for summary judgment of the Subrogated RICO Payment Action as being barred by section 4545(c) is denied.

### 3. Statute of Limitations

Actions under civil RICO are subject to a four year limitations period that

begins to run when the injury occurs. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

■ Determination of the limitations period is complicated when the same pattern of racketeering activity results in multiple injuries spread over time. *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir.1988) ("Even after injury has occurred ... and a civil RICO claim has accrued, there will frequently be additional, independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to plaintiff's business or property."). To deal with such instances, the court of appeals for the Second Circuit has adopted the "separate accrual rule under which a new claim accrues, triggering a new four-year limitations period, each time a plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt,* 66 F.3d 553, 559 (2d Cir.1995).

The court of appeals has held that "[a] necessary corollary of the separate accrual rule is that [a] plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Id.* at 560 ("As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year 'window' before suit was filed, together, of course, with any provable future damages").

The statute of limitations inquiry first requires a determination of "when the [plaintiffs] sustained the alleged injur[ies] for which they seek redress." *In re Merrill Lynch Ltd. Partnerships Litig. ("Merrill Lynch II"),* 154 F.3d 56, 59 (2d Cir. 1998) (per curiam).

With respect to the RICO Payment Action, Empire's alleged injuries occurred on the date that each claim was filed with it, because that is the earliest possible date Empire could have discovered that specific economic injury. *Cf. Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 347 (E.D.N.Y.2000). In light of the four year statute of limitations, therefore, Empire may only recover for claims filed with it on or after April 29, 1994—four years from the date it first filed suit. Recovery on the RICO Payment Action prior to that date is barred.

As to the Subrogated RICO Payment Action, determination of the limitations period turns not on injury discovery or discoverability by Empire, but rather on when the injuries were discovered or first discoverable by each Plan member. *See Insurance Co. of N.Am. v. United States,* 561 F.Supp. 106, 119 (E.D.Pa.1983); *see also Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 260 (2d Cir.1999) (insurer-subrogee's claims are "subject to whatever defenses the tortfeasor has against the insured"). Thus, Empire may only recover under the Subrogated RICO Payment Action for smoking-related health care costs it covered for Plan members to the extent the Plan members discovered the particular underlying injuries within four years of the filing of the complaint. Statistical extrapolation based on Empire's deposed Plan members may be utilized to address this factual issue.

■ Empire contends unpersuasively that the statute of limitations was tolled due to fraudulent concealment on the part of Tobacco. To toll the limitations bar using the fraudulent concealment doctrine, a plaintiff must establish three things: (1) that it diligently and thoroughly investigated its claims in a timely manner; (2) that the defendants actively thwarted its investigation; and (3) that, despite its diligent investigation and other knowledge chargeable to it, the plaintiff had no notice of its claims throughout the limitations period. *See Klehr v. A.O. Smith Corp.,* 521 U.S.

179, 194–96, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997).

■■■ A defense of fraudulent concealment fails if the plaintiff had either actual or inquiry notice of its claims and did not diligently and thoroughly investigate. *See, e.g., In re Merrill Lynch Ltd. Patnerships Litig. ("Merrill Lynch I"),* 7 F.Supp.2d 256, 265–66 (S.D.N.Y.1997). Inquiry notice exists when, under the totality of the circumstances, "a reasonable [person] of ordinary intelligence would have discovered the existence of the fraud." *Merrill Lynch II,* 154 F.3d at 60. A plaintiff's sophistication in the subject areas at issue is relevant in determining whether inquiry notice exists. *See, e.g., Kinley Corp. v. Integrated Resources Equity Corp.,* 851 F.Supp. 556, 568 (S.D.N.Y.1994) ("The Plaintiffs' sophistication in financial matters can be considered in determining when inquiry notice was triggered."). Once the plaintiff is confronted with "evidence contradicting representations made to [it]," it is put on inquiry notice of its claims, giving rise to a duty to investigate. *Congregacion de la Mision Provincia de Venezuela v. Curi,* 978 F.Supp. 435, 444 (E.D.N.Y.1997); *Kinley Corp.,* 851 F.Supp. at 567.

■■■ The Blues' own publications indicate that each of them was aware of information contradicting Tobacco's assertions that smoking is neither injurious to health nor addictive. For example, a 1978 publication of Blue Cross and Blue Shield of Greater New York entitled "7–Day Plan to Help You Stop Smoking Cigarettes" lists the following benefits of quitting:

1. Add years to your life;
2. Help avoid lung cancer, emphysema, bronchitis and heart attacks;
3. Give heart and circulatory system a break;
4. Lose your smoker's hack;
5. Feel more vigorous in sports;
6. Improve stamina; [and]
7. Stop smoke-related head and stomach aches; . . . .

As a second example, a 1992 Blue Cross and Blue Shield of Greater New York publication stated that "[c]igarette smoking is the 'most important health issue of our time' " and pointed out that "some 30 percent of all cancer deaths are attributable to smoking." These and similar materials proffered by defendants indicate that Empire had inquiry notice sufficient to trigger a duty to investigate the possibility of fraud by Tobacco given the obvious inconsistencies between publications of the various Blues and defendants' assertions.

Having failed to establish a material question as to whether it diligently and thoroughly inquired, Empire cannot now assert fraudulent concealment to toll the statute of limitations.

### 4. Future Damages

■■ Recovery under the RICO Payment Action for any future damages Empire may suffer has already been denied in an early order due to the speculative nature of Empire's future damages. *See Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.,* 98–CV–3287, 2000 WL 1339554, at * 1 (E.D.N.Y. September 12, 2000); *cf. Falise v. American Tobacco Co.,* 91 F.Supp.2d 525, 527 (E.D.N.Y.2000) (recovery of future damages until 2050 permitted; future costs to Manville Trust reasonably fixed due to comprehensive matrix payment plan). Uncertainty as to the size and composition of Empire's future pool of Plan Members, the difficulty in forecasting future medical care costs, and the potential for vast restructuring of the national health delivery system through either private or governmental efforts make it impossible to calculate Empire's future damages with any reasonable degree of certainty. *See Bankers Trust,* 859 F.2d at 1104 ("[F]uture damages arising from defendants' conduct are unrecoverable if the fact of their accrual is speculative or the amount and nature unprovable. In such cases, refusal to award future damages as too speculative is equivalent to holding that no cause of action has yet

accrued for any but those damages already suffered. The cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted." (internal quotation marks and citations omitted)); *see generally* George J. Annas, Sylvia A. Law, Rand E. Rosenblatt, & Kenneth R. Wing, *American Health Law* ch. 2, at 121–64 (1990) (role and regulation of private third payers in American healthcare system); *id.* ch. 4, at 316–58 (impact of medical technology on healthcare cost and rationing); *id.* ch. 8, at 774–89 (alternatives to fee-for-service healthcare insurance).

 Beyond the highly speculative nature of predicting future damages, recovery by Empire of future damages under the Subrogated RICO Payment Action faces the additional barrier that a right to recover in equitable subrogation does not arise under New York law until the insurer actually pays the costs for which recovery is sought. *See, e.g., Federal Ins. Co. v. Arthur Andersen & Co.,* 75 N.Y.2d 366, 372, 553 N.Y.S.2d 291, 552 N.E.2d 870 (1990) ("[Equitable subrogation rights] accrue upon payment of the loss ...."); *Gibbs v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 106 (2d Cir.1992) ("The general rule is that an insurer's right to subrogation attached, by operation of law, on paying an insured's loss"). Thus, future damages also cannot be recovered under the Subrogated RICO Payment Action.

### C. Section 1962(a)

 Empire's RICO Investment Action seeks recovery under civil RICO for a violation of section 1962(a) of Title 18.

Section 1962(a) provides:

It shall be unlawful for any person who has received income derived, directly or indirectly, from a pattern of racketeering activity ... to invest, directly or indirectly, any part of such income, in the acquisition of any interest in, or the establishment of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1964(c) establishes a civil cause of action for recovery of injuries resulting "by reason of" violations of this provision. 18 U.S.C. § 1964(c).

The "by reason of" language in the context of a section 1962(a) violation requires that *the alleged injury must have been caused by the investment of the racketeering proceeds. See, e.g., Compagnie De Reassurance v. New England Reinsurance,* 57 F.3d 56, 91 (1st Cir.1995) ("in proving a right to recovery for a RICO violation premised upon § 1962(a), the plaintiffs had to prove that they *were harmed by reason of [defendant's] use or investment of income derived from a pattern of racketeering activity ....* " (emphasis added)); *Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 584 (5th Cir.1992) ("the causal language of section 1964(c) requires that the compensable injury stem from the violation of the RICO section in question, so *any injury under section 1962(a) must flow from the use or investment of racketeering income* " (emphasis added)); *Ouaknine v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990) ("[B]ecause the conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff *must allege injury from defendant's investment of the racketeering income* to recover under § 1962(a)." (emphasis added)); *see also Beck v. Prupis,* 529 U.S. 494, —— n. 9, 120 S.Ct. 1608, 1616 n. 9, 146 L.Ed.2d 561 (2000) ("[M]ost courts of appeals have adopted the so-called *investment injury rule,* which requires that a plaintiff suing for a violation of § 1962(a) allege injury from the defendant's 'use or invest[ment]' of income derived from racketeering activity." (internal citations omitted)).

A necessary corollary of the "by reason of" "use and investment" requirement for section 1962(a) violations is that "the plaintiff [must] allege a 'use or investment'

injury that is *distinct* from the injuries resulting from [the racketeering] predicate acts." *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 349 (E.D.N.Y.2000) (quoting *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996)); *see Vemco, Inc. v. Camardella,* 23 F.3d 129, 133 (6th Cir. 1994) ("Nowhere in the amended complaint ... did [plaintiff] allege an injury stemming from the investment, distinct from injuries stemming from predicate acts .... Such allegations do not meet th[e] ... requirement of a distinct 'investment injury.' "). "Where reinvestment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity." *Falise,* 94 F.Supp.2d at 349; *see, e.g., Kaczmarek v. Inter. Bus. Machs. Corp.,* 30 F.Supp.2d 626, 628 (S.D.N.Y.1998) ("Mere reinvestment of racketeering income into the same racketeering enterprise that generated the income 'does not satisfy the Second Circuit's holding in *Ouaknine* ' because 'investment of the proceeds from the pattern of racketeering for general operations is too attenuated a causal connection to satisfy section 1962(a) and 1964(c).' Under these circumstances, *the real cause of the injury remains the racketeering acts, not the investment of the proceeds in the enterprise.*" (emphasis added)); *Protter v. Nathan's Famous Systems, Inc.,* 925 F.Supp. 947, 954 (E.D.N.Y.1996) (same).

■ Review of plaintiff's RICO Investment Action reveals that no injury caused by the "use and investment" of racketeering proceeds has been pled. The RICO Investment Action is simply a claim that defendants reinvested the proceeds of their alleged racketeering scheme, the Tobacco Conspiracy, back into it. According to Empire, defendants engaged in a pattern of racketeering activity from 1953 through the present ("Tobacco Conspiracy"), with the racketeering enterprise generating income through:

the suppression and concealment of scientific and medical information regarding the health effects of nicotine products; the suppression of a market for alternative safer or less addictive tobacco products; the manipulation of nicotine to create and sustain addiction to [d]efendants' products; the targeting of teenagers and children and minorities with marketing and advertising designed to addict them ...; and the avoidance and shifting of smoking related health care costs to others including the [Blues] Plans ....

Compl. ¶ 295. The income generated through these activities was then used and invested:

for the specific purpose and ... effect of controlling the material information distributed to the public concerning the health effects of smoking; suppressing and concealing scientific and medical information regarding the adverse health effects of smoking and the alternatives of safer or lesser-addictive cigarettes; devising means for manipulating nicotine to create and sustain addiction to [d]efendants' products; directing marketing and advertising toward minorities, teenagers and children to addict them; and enticing more individuals to smoke or to use [d]efendants' unsafe nicotine tobacco products.

Compl. ¶ 296.

Empire's allegations comprising the RICO Investment Action do not satisfy the requirement for claims premised on section 1962(a) that the purported investment injury be *distinct from the injuries resulting from the predicate acts that comprise the racketeering scheme* (injuries appropriately pled as section 1962(c) violations). The motion for summary judgment on this theory is granted.

### D. Section 1962(d)

Section 1962(d) makes it unlawful "for any person to conspire to violate any provisions of subsection (a), (b), or (c) of" section 1962. 18 U.S.C. § 1962(d). Em-

pire has pled conspiracy allegations under section 1962(d) with respect to the RICO Payment Action, the Subrogated RICO Payment Action, the RICO Smoking Reduction Action, and the RICO Investment Action.

 Under the law of this circuit, a claim under section 1962(d) alleging a conspiracy to violate the other subsections fails as a matter of law if the substantive claims based on the other subsections are defective. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996) (citing and quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) (" 'Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.' ")); *see also Danielsen v. Burnside–Ott Aviation Training Center*, 941 F.2d 1220, 1232 (D.C.Cir.1991) (same). Since this court last addressed this question in *Falise*, 94 F.Supp.2d at 353, the Supreme Court has expressly declined to "resolve whether a plaintiff suing under § 1964(c) for a RICO conspiracy must allege an actionable violation under §§ 1962(a)-(c), or whether it is sufficient for the plaintiff to allege an agreement to complete a substantive violation and the commission of at least one act of racketeering that caused him injury." *Beck v. Prupis*, 529 U.S. 494, —— n. 10, 120 S.Ct. 1608, 1618 n. 10, 146 L.Ed.2d 561 (2000).

In the absence of contrary direction from the Supreme Court, the law of this circuit requiring actionable violations of section 1962(a)-(c) in order to establish a conspiracy claim under section 1962(d) still applies. Plaintiff's section 1962(d) conspiracy claims related to the RICO Smoking–Reduction Action and the RICO Investment Action are therefore dismissed.

## V STATE FRAUD–BASED ACTIONS

Empire has advanced four state actions sounding in fraud and seeking recovery of monies it has expended to cover the health care costs of its injured insured suffering smoking-related illnesses. Two of the state claims are pled as direct causes-of-action: one alleging common-law fraud violations ("Direct Fraud Action") and a second alleging violations of sections 349 and 350 of the New York Consumer Protection Act. *See* N.Y. Gen.Bus.Law § 349(a) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); § N.Y. Gen. Bus.Law § 350 ("False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

Two related state causes of action are pled in equitable subrogation for recovery of health care costs compensated by Empire on behalf of injured smokers. These subrogated actions are premised on common-law fraud and New York Consumer Protection Act violations.

As with Empire's subrogation rights under civil RICO, *see supra* Part IV.B.2.b.i., New York subrogation law governs Empire's subrogation rights as to the subrogated state law actions. *See, e.g., Falise v. American Tobacco Co.*, 94 F.Supp.2d 316, 353–54 (E.D.N.Y.2000) (New York law applied to fraud claims of Manville Trust); *see also Bergeron v. Philip Morris, Inc.*, 100 F.Supp.2d 164, 169 (E.D.N.Y.2000) ("The same choice-of-law principles that determine whether a plaintiff has a claim under a particular state's common law apply to resolve conflicts between application of competing states' statutes."); *see generally* Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 Colum. L.Rev. 772, 827 (1983).

 The Direct Fraud Claim, alleging that Empire suffered injury by relying on Tobacco's misconduct in not adopting differential premium pricing or in not adopting smoking cessation programs, fails. Detrimental reliance alone is not sufficient to make out a fraud claim; rather, the reliance must be *justified* under the cir-

cumstances. *See, e.g., Eagle Comtronics, Inc. v. Pico Products,* 270 A.D.2d 832, 705 N.Y.S.2d 758, 759–60 (2000) ("In order to prevail on the fraud cause of action, [plaintiff] had to establish that the alleged misrepresentations or omissions were material and that [it] actually and justifiably relied on them to its detriment."); *Abrahami v. UPC Constr. Co.,* 224 A.D.2d 231, 638 N.Y.S.2d 11, 13 (1st Dept.1996) ("It is well-settled that in order to demonstrate fraud, plaintiffs must establish ... justifiable reliance ...."); *see generally* Dan B. Dobbs, *The Law of Torts* §§ 474–75 (justifiable reliance).

 It cannot reasonably be supposed that Empire—given both its financial incentive to determine the true health effects of smoking and the myriad of resources at its disposal to do so—could have been justified in relying on any misrepresentations of Tobacco regarding the health effects of smoking. *See, e.g., Pinney v. Beckwith,* 202 A.D.2d 767, 608 N.Y.S.2d 738, 739 (3d Dept.1994) ("It is well settled that 'if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.' " (quoting *Schumaker v. Mather,* 133 N.Y. 590, 596, 30 N.E. 755 (1892))); *id.* ("[A] simple inquiry to the Town, the barest of precautions, would have armed plaintiffs with the truth concerning the claimed preliminary subdivision approval."); *see also Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) ("[R]eliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud"). Empire's direct fraud action is dismissed.

 Empire's direct claims under New York's Consumer Protection statute do not suffer the same defect—lack of justifiable reliance. The New York court of appeals has recently held there is no reliance requirement under section 349. *See Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000) (Kaye,C.J.) (reliance is not an element of a section 349 claim). And though the New York Court of Appeals has not expressly ruled on whether reliance is a requirement under section 350, the same conclusion would seem to follow from the court's decision in *Stutman. See, e.g., Geismar v. Abraham & Straus,* 109 Misc.2d 495, 439 N.Y.S.2d 1005, 1007 (N.Y.Sup.Ct.1981) ("[T]o establish a right to recover damages in [a section 350] action the plaintiff need only establish that the advertisement was misleading in a material respect and that she was 'injured.' "). *But see Gershon v. Hertz Corp.,* 215 A.D.2d 202, 626 N.Y.S.2d 80, 81 (1st Dept.1995) (claims under section 350 require reliance).

With respect to Empire's subrogated fraud and subrogated New York Consumer Protection Act claims, it should be noted that the same principles of equitable subrogation discussed for the Subrogated RICO Payment Action apply. *See supra* Part IV.B.2.a & b.

## VI PREEMPTION

 Defendants seek partial summary judgment of the RICO claims alleging that a number of the predicate acts of mail and wire fraud relied on by Empire to establish a "pattern of racketeering activity" are preempted by the Federal Cigarette Labeling and Advertising Act ("Labeling Act"). *See* 15 U.S.C. §§ 1331–40. Specifically, defendants contend that Empire's "allegations of mail and wire fraud ... are based in part on claims of fraudulent concealment, [and] nondisclosure or 'omission' of information" in product advertisements and promotional materials that are preempted. Defendants' objections to use of these allegations is also understood as applying to plaintiff's claims under the New York Consumer Protection Act.

The Labeling Act requires statutorily prescribed uniform warning labels on ciga-

rette packages. *Id.* § 1333. It also preempts common-law duties and causes-of-action "based on smoking and health with respect to advertising and promotion." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 525, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion); *see id.* § 1334(b). Section 1334(b) provides:

> "No statement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the [requirements of section 1333]."

In *Cipollone,* the Supreme Court addressed the reach of the Labeling Act's preemptive effect. The Court expressly rejected the "suggestion that [section 1334(b)] pre-empts liability for omissions but not for acts, or that [section 1334(b)] pre-empts liability for unintentional torts but not for intentional torts." *Cipollone,* 505 U.S. at 523, 112 S.Ct. 2608. Instead, the Court held that determinations of preemption require a careful analysis of whether the legal duty underlying the purported violation is based on state law obligations regarding "smoking and health" considerations or "on a more general obligation," such as the duty not to deceive. *Id.* at 528, 112 S.Ct. 2608. The *Cipollone* Court based this conclusion on two considerations:

> First, in the [Labeling Act], Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud. To the contrary, both the [earlier 1965 Act—upon which the 1969 Labeling Act was modeled] and the 1969 Act[ ] explicitly reserved the FTC's authority to identify and punish deceptive advertising practices[.] Moreover, this reading of [section 1334(b)] is wholly consistent with the purposes of the 1969 Act. State-law prohibitions on false statements of material fact do not create "diverse, nonuniform, and confusing" standards [ the prevention of which had been a prime concern in passing the Labeling Act]. Unlike state-law obligations concerning

the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity. *Cipollone,* 505 U.S. at 529, 112 S.Ct. 2608.

Defendants challenge the use of allegations of fraudulent concealment and intentional nondisclosure to establish the RICO violations, alleging that reliance on such conduct to state RICO predicate violations is preempted by the Labeling Act to the extent that the conduct involves cigarette advertising and promotion. *See id.* at 528, 112 S.Ct. 2608 ("[C]laims that [Tobacco] concealed material facts are ... not preempted *insofar as those claims rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion.*" (emphasis added)). As support for this position, defendants rely on the *Cipollone* Court's holding that an intentional fraud action can not be supported by proof of "concealed material facts" in advertising or product promotional materials since the Labeling Act preempts obligations *imposed under state law* with respect to omissions in advertising and product promotion.

State law cannot require the imposition of additional cigarette health and safety warnings *as part of a specific duty based strictly on smoking and safety with respect to product advertisements or product promotions* beyond those expressly mandated in the Labeling Act. *See id.* at 525, 112 S.Ct. 2608 ("The appropriate inquiry is not whether a claim challenges the 'propriety' of advertising and promotion, but whether the claim would require the imposition under state law of a requirement or prohibition based on smoking and health with respect to advertising promotion"). If plaintiffs were forced to rely solely on a common law obligation *specific to smoking and health* as a basis for Tobacco's duty to disclose material information in its product advertisements and promotional materials regarding the health effects of smoking, plaintiffs would arguably be foreclosed from relying on this conduct in establishing the wire fraud and mail fraud predicate acts on preemption grounds.

Defendants *assumed on their own initiative* an express obligation in both their advertisements and in their public statements to smokers generally to accurately present the health risks of cigarette use to smokers, however. This commitment was undertaken at least as early as January 4, 1954, when the defendants published a national advertisement entitled "A Frank Statement to Cigarette Smokers." It stated they accepted as a basic responsibility paramount to every other consideration in their business the obligation of researching and accurately presenting the health effects of cigarette use to smokers.

Since that time, the defendants have repeatedly maintained this express obligation through statements released to the public in various advertisements and other promotional releases. By doing so, Tobacco expressly assumed (as opposed to a state imposing) the specific obligation to fully and accurately present the health effects of cigarette use to the American public. The Labeling Act does not immunize Tobacco from obligations it has accepted *on its own initiative* regarding the disclosure of "smoking and health" information, only those specifically imposed by state law. *See, e.g., id.* at 525–26, 97 S.Ct. 1272 ("While the general duty not to breach warranties arises under state law, the particular 'requirement . . . based on smoking and health . . . with respect to the advertising or promotion [of] cigarettes' in an express warranty claim arises from the manufacturer's statements in its advertisements").

Predicate acts pled under civil RICO, as well as deceptive acts pled under the New York Consumer Protection Act, that are based on fraudulent concealment and nondisclosure of the health effects of cigarettes—made while defendants were falsely claiming in their advertisements and promotions that they were making and would make full disclosure—are not preempted.

## VII CONCLUSION

Defendants' motions for summary judgment with respect to the RICO Smoking Reduction Action, the RICO Investment Action, and the Direct Fraud action are granted. *See* Fed.R.Civ.P. 56(c). Their summary judgment motions with respect to the RICO Payment Action and the Subrogated RICO Payment Action are denied. The motions may be renewed following the *Daubert* hearing if then warranted.

SO ORDERED.